# Richmond

COMMONWEALTH OF VIRGINIA v. BALTIMORE STEAM PACKET COMPANY.

COMMONWEALTH OF VIRGINIA v. NORFOLK, BALTIMORE AND CAROLINA LINE, INCORPORATED.

December 3, 1951.

Record Nos. 3888, 3889.

Present, All the Justices.

The opinion states the case.

*J. Lindsay Almond, Jr., Attorney General* and *Henry T. Wickham, Assistant Attorney General,* for the Commonwealth.

*Tazwell Taylor, Jr.,* for appellee, Baltimore Steam Packet Company.

*John W. Oast, Jr.,* for appellee, Norfolk, Baltimore and Carolina Line, Inc.

*Hunton, Williams, Anderson, Gay & Moore,* amicus curiae.

BUCHANAN, J., delivered the opinion of the court.

The appellees, steamship companies, herein referred to as Baltimore and Norfolk, applied to the State Corporation Commission for correction of assessments of state taxes made against them in 1950 by the Commission, based on their gross receipts for 1949, under the provisions of Title 58, Chapter 12, Article 7 of the Code. Their contention was that section 58-575[1], Article 7, under which the tax was levied, was invalid because it violated the Commerce Clause, Article I, Section 8, clause 3, and the Duty of Tonnage Clause, Article I, Section 10, clause 3, of the Federal Constitution. Railway Express Agency, Inc., filed a brief in this court as *amicus curiae.*

The points at issue on the two applications were the same. The facts were stipulated and the two cases heard together.

---

[1] § 58-575. Annual license tax.—Every such company ·for· the privilege of doing business in this State, in addition to the annual registration fee and property tax, shall pay an annual State license tax as follows:

Such tax shall be equal to one and one-half per centum upon the gross receipts from operation up to and not in excess of five hundred thousand dollars and one and three-fourths per centum upon such receipts in excess of that amount of such companies, and each of them, within this State.

When such companies are operated partly within and partly without this State, the gross receipts within this State shall be deemed to be all receipts on business beginning and ending within this State and all receipts earned in this State on business passing through, into or out of this State; provided that unless otherwise clearly shown such last mentioned receipts shall be deemed to be that proportion of the total receipts from such business which the entire line mileage over which the business is done bears to the mileage operated within this State.

The provisions of this section shall apply to the assessment for the tax year nineteen hundred forty-nine and every tax year thereafter, until otherwise ordered by law. (1926, p. 955; 1928, p. 154; 1936, p. 534; 1938, p. 412; 1944, p. 110; Tax Code, § 222; 1948, p. 925.)

Baltimore is a Maryland corporation with its principal office in the city of Baltimore. During 1949 it owned and operated three steamships in the transportation of passengers and freight, two operating daily between the city of Baltimore, in Maryland, and the city of Norfolk, in Virginia, and the third between Washington, D. C., and Norfolk. Each vessel made a trip one way on alternate days, and each stopped at Old Point, in Virginia, for the purpose of receiving and discharging passengers and freight.

Norfolk is a Virginia corporation with its principal office in the city of Norfolk. In 1949 it owned and operated seven motor vessels, a tug, and a barge, in the transportation of freight between the city of Baltimore, Maryland, and Charleston, South Carolina, "via Norfolk and intermediate points for the purpose of receiving and discharging freight." During part of 1949 it operated a line intrastate in Virginia between Norfolk and Richmond, but that was abandoned after a few months of operation.

During the entire period of this controversy all of these ships were duly enrolled and licensed in conformity with Title 46, Chapter 12, of the United States Code relating to the "Regulation of Vessels in Domestic Commerce," 46 USCA, § 251 ff., and each thereby became a ship and vessel of the United States, entitled to the privileges secured to such ships and vessels by Federal statutes and regulations for enrolling and licensing ships employed in the coasting trade.

For the tax years 1949 and 1950 both companies were assessed with and have paid, in addition to the annual registration fee, taxes on their floating equipment at Norfolk, land, structures and money on deposit, located in Virginia. Only the tax on money (and intangibles) is payable to the State; that on real estate and tangible personal property is payable to the localities. Code, § 58-574.

The Commission held that the companies were liable for the tax on receipts from their intrastate business; i. e., "on business beginning and ending within this State," amounting to $34.31 in the case of Baltimore and $104.86 in the case of Norfolk. No cross-error was assigned to that ruling, and its correctness is not in issue on this appeal. But a majority of the Commission, Commissioner Catterall dissenting, held that the tax on receipts earned in this State on business "passing through, into or out of this State," was invalid, and the assessments were accordingly reduced, being a reduction of $18,981.20 on Baltimore's assess-

ment and $2,365.59 on the assessment against Norfolk. From the latter ruling the Commonwealth appeals.

The Commission based its holding on two grounds: (1) That the assessment on interstate business was not made in accordance with the statute; and that if it had been, it would be invalid because not a proper apportionment, this because of the language of the statute that receipts earned in Virginia on interstate business, unless otherwise clearly shown (which was not attempted to be done here) shall be deemed to be that proportion of the total receipts "which the entire line mileage over which the business is done bears to the mileage operated within this State." Literally that formula results in · an improper fraction, the numerator being greater than the denominator. That, of course, was not intended, and no objection on that score was made by the appellees before the Commission. On the contrary, appellees stipulated that the amount of the tax "has been properly computed in accordance with the provisions of section 58-575 of the Code of Virginia." It is not necessary to resort to the formula to compute the tax. The actual receipts control if clearly shown. Appellees were content not to show them but, instead, to stipulate that the amount of the tax had been properly computed. We see no necessity for denying them the privilege of entering into that agreement, or for refusing to respect it in deciding the cases.

■ We do not think the assessments violated in any way the third clause of section 10, Article I of the Constitution, providing that "No state shall, without the consent of Congress, lay any duty of tonnage." That prohibition forbids a tax "upon the privilege of access by vessels or goods to the ports or to the territorial limits of a state," and applies to taxes and duties "which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Clyde Mallory Lines* v. *Alabama*, 296 U. S. 261, 56 S. Ct. 194, 80 L. ed. 215. 48 Am. Jur., Shipping, § 651, p. 454. This is not that sort of tax.

The main question is whether the assessments violate the Commerce Clause, Article I, Section 8, clause 3, of the Constitution. The decision of it is, of course, controlled by the rulings of the United States Supreme Court. It is a problem that has engaged the attention of that court many times and in many forms, and rarely has it been settled in a given case by a unanimous court. The difficulties began long ago and they have increased with the expansion of the definition of interstate com-

merce and the increasing complexities of trade. The statement of Mr. Justice Holmes in *Galveston, etc., R. Co.* v. *Texas*, 210 U. S. 217, 28 S. Ct. 638, 52 L. ed. 1031, 1036, that since "not every law that affects commerce among the states is a regulation of it in a constitutional sense, nice distinctions are to be expected," has proved prophetic.

On the same day in 1873 the Supreme Court decided the *Case of the State Freight Tax*, 15 Wall. (82 U. S.) 232, 21 L. ed. 146; and the case of the *State Tax on Railway Gross Receipts*, 15 Wall. (82 U. S.) 284, 21 L. ed. 164. In the former a tax on freight transported into or out of the State was held invalid as a direct burden on interstate commerce; in the latter a tax on the gross receipts of a railway company derived in part from interstate transportation was held constitutional, three justices dissenting.

Fourteen years later, in *Philadelphia, etc., Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, 7 S. Ct. 1118, 30 L. ed. 1200, a tax levied on the gross receipts of a steamship company derived from freight and passengers carried on the ocean and navigable waters of the United States, and no part of which was received for transportation between places in the State, was held unconstitutional. The court said that the State could not constitutionally regulate interstate or foreign commerce, and that taxation was one of the principal forms of regulation; that if the State could not tax the transportation it ought not to tax the freights and fares received therefrom. "It would seem to be rather metaphysics than plain logic for the state officials to say to the Company: 'We will not tax you for the transportation you perform, but we will tax you for what you get for performing it.'" The court quoted this from *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 5 S. Ct. 826, 29 L. ed. 158: "'While it is conceded that the property in a State belonging to a foreign corporation engaged in foreign or interstate commerce may be taxed equally with like property of a domestic corporation engaged in that business, we are clear that a tax or other burden imposed upon the property of either corporation because it is used to carry on that commerce, or upon the transportation of persons or property, or for the navigation of the public waters over which the transportation is made, is invalid and void as an interference with, and obstruction of, the power of Congress in the regulation of such commerce.'" 30 L. ed. at p. 1204.

In *Maine* v. *Grand Trunk Ry. Co.* (1891), 142 U. S. 217, 12 S. Ct. 121, 163, 35 L. ed. 994, the court held valid a tax on the gross transportation receipts in the State of a railroad lying partly within and partly without the State, ascertained by multiplying its average gross receipts per mile over its whole length by the number of miles in the State. The opinion held:

The tax "is an excise tax upon the defendant corporation for the privilege of exercising its franchises within the State of Maine. It is so declared in the statute which imposes it; and that a tax of this character is within the power of the State to levy there can be no question;" and, further, that the privilege of exercising the franchises of a corporation within a State is generally one of value; that the corporation should be made to bear some proportion of the burdens of government; that the granting of the privilege, whether the corporation be domestic or foreign, may be conferred upon such conditions as the State deemed most conducive to its interests; that it may require the payment of a specific sum each year, or apportion the amount according to the value of the business permitted, as disclosed by its gains or receipts of the present or past years; that the rule of apportioning the charge to the receipts of the business would seem to be eminently reasonable.

Referring to the ruling below that the tax was in effect the imposition of the tax upon the transportation receipts and, therefore, an interference with interstate commerce, the court said: "A resort to those receipts was simply to ascertain the value of the business done by the corporation, and thus obtain a guide to a reasonable conclusion as to the amount of the excise tax which should be levied; and we are unable to perceive in that resort any interference with transportation, domestic or foreign, over the road of the railroad company, or any regulation of commerce which consists in such transportation. * * * There is no levy by the statute on the receipts themselves, either in form or fact; they constitute, as said above, simply the means of ascertaining the value of the privilege conferred."

In *Postal Tel. Cable Co.* v. *Adams,* 155 U. S. 688, 15 S. Ct. 268, 360, 39 L. ed. 311, a Mississippi statute laid a levy, as a privilege tax, "in lieu of other state, county, and municipal taxes," upon the Telegraph Company, apportioned to its wire mileage in the state. It was held to be valid. The court said that property in a State belonging to either a foreign or domestic corporation

engaged in interstate commerce could be taxed in the form of a tax for the privilege of exercising its franchises in the state, if the ascertainment is made dependent in fact on the value of its property situated in the state, and "if payment be not made a condition precedent to the right to carry on the business, but its enforcement left to the ordinary means devised for the collection of taxes." And, further, "the value of property results from the use to which it is put and varies with the profitableness of that use, and by whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property or a just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the Constitution."

*Galveston, etc., R. Co.* v. *Texas, supra,* was decided in 1908. There the statute imposed a tax equal to 1% on gross receipts on railroads "if such line of railroad lies wholly within the state." The lines of the railroads involved were wholly within the state but connected with other lines and a part, in some instances much the larger part, of their receipts was for the interstate carriage of passengers and of freight. The case was held to be ruled by *Philadelphia, etc., Steamship Co.* v. *Pennsylvania, supra,* and the tax invalid as being "merely an effort to reach the gross receipts, not even disguised by the name of an occupation tax."

In the course of the majority opinion, by Mr. Justice Holmes, it was said that as the property of companies engaged in interstate commerce may be taxed, "and may be taxed at its value as it is, in its organic relations, and not merely as a congeries of unrelated items, taxes on such property have been sustained that took account of the augmentation of value from the commerce in which it was engaged;" that the difficulty of distinction between taxes on property and taxes on receipts became greater "when it was decided, not without much debate and difference of opinion, that interstate carriers' property might be taxed as a going concern," referring to *Wisconsin, etc., R. Co.* v. *Powers,* 191 U. S. 379, 24 S. Ct. 107, 48 L. ed. 229.

It was said that in *Maine* v. *Grand Trunk Ry. Co., supra,* "The estimated gross receipts per mile may be said to have been made a measure of the value of the property per mile. That the effort of the state was to reach that value, and not to fasten on the receipts from transportation as such, was shown by the fact that the scheme of the statute was to establish a system. The

buildings of the railroad and its lands and fixtures outside of its right of way were to be taxed locally, as other property was taxed, and this excise with the local tax were to be in lieu of all taxes. The language shows that the local tax was not expected to include the additional value gained by the property being part of a going concern. That idea came in later. The excise was an attempt to reach that additional value. The two taxes together fairly may be called a commutation tax.''

Again it was said that ''Neither the state courts nor the legislatures, by giving the tax a particular name or by the use of some form of words, can take away our duty to consider its nature and effect. If it bears upon commerce among the states so directly as to amount to a regulation in a relatively immediate way, it will not be saved by name or form.''

No attempt was found in the statute ''to reach the property and to let the interstate traffic and the receipts from it alone,'' but an inference was drawn from the judgment of the State court and from the argument ''that another tax on the property of the railroad is upon a valuation of that property, taken as a going concern.'' The Chief Justice and three justices dissented on the ground that the tax was not laid directly upon gross receipts, as in *Philadelphia, etc., Steamship Co.* v. *Pennsylvania, supra,* but was an occupation tax operating only incidentally on interstate commerce.

In *Meyer* v. *Wells, Fargo & Co.,* 223 U. S. 298, 32 S. Ct. 218, 56 L. ed. 445, an Oklahoma statute imposed on express companies and others a gross revenue tax ''which shall be in addition to the taxes levied and collected upon an ad valorem basis upon the property and assets of such corporation,'' apportioned, as to a corporation operating partly within and partly without, on the ratio of its business in the State to its whole business. The receipts of the express company, a non-resident, were largely from commerce among the States. In the unanimous opinion written by Mr. Justice Holmes it was held that the tax was invalid; that the scope and purpose of the act were too obvious to admit the view that it was a property tax, because all the property *and assets* were made subject to *ad valorem* tax, and therefore ''this tax cannot be an attempt to reach the value of what is by the law to be valued and taxed in a different way. It would be difficult to apply to a tax levied in these days the explanation of *Maine* v. *Grand Trunk Ry. Co.* * * * and to suppose it intended

to reach only the additional value given by its being part of a going concern to property already taxed in its separate items.''

On the same day, however, February 19, 1912, in *United States Exp. Co.* v. *Minnesota,* 223 U. S. 335, 32 S. Ct. 211, 56 L. ed. 459, the court in a unanimous opinion held valid a tax on gross receipts of the non-resident Express Company, ''which shall be in lieu of all taxes upon its property,'' part of which receipts came from interstate commerce. The court explained that the statute in *Galveston, etc., R. Co.* v. *Texas, supra,* was condemned because it was an attempt to reach receipts from interstate commerce when it appeared that another tax on the property had already been levied, ''covering its full value as a going concern;'' and that upon like reasoning the statute of Oklahoma in the *Meyer* v. *Wells, Fargo & Co. Case, supra,* had been condemned. The court said that the statute presently under review was ''the only mode prescribed in Minnesota for exercising the recognized authority of the state to tax the property of express companies as going concerns within its jurisdiction.'' Again: ''The tax to be collected in part from the earnings of interstate commerce was part of a scheme of taxation seeking to reach the value of the property of such companies in the state, measured by the receipts from business done within the state,'' and, ''was not aimed exclusively at the avails of interstate commerce.''

In *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 58 S. Ct. 546, 82 L. ed. 823, 115 A. L. R. 944, the court, sustaining a tax on the receipts of advertising space by newspaper and magazine publishers, repeated the frequently used phrase that ''Even interstate business must pay its way, * * * and if the property devoted to interstate transportation is used both within and without the state, a tax fairly apportioned to its use within the state will be sustained;'' that the vice characteristic of those which have been held invalid ''is that they have placed on the commerce burdens of such a nature as to be capable in point of substance, of being imposed, * * or added to, * * with equal right by every state which the commerce touches, merely because interstate commerce is being done, so that without the protection of the commerce clause it would bear cumulative burdens not imposed on local commerce.''

In *Freeman* v. *Hewit,* 329 U. S. 249, 67 S. Ct. 274, 91 L. ed. 265, Mr. Justice Rutledge, in his concurring opinion, note 13, p. 283 of 67 S. Ct., said that gross receipts taxes which have been

sustained fall into the following groups: (a) Those which were fairly apportioned, and (b) Those which have been justified on a "local incidence" theory; and that gross receipts taxes which have not been sustained fall into these groups: (a) Those which were not fairly apportioned; (b) Those which were not apportioned and subjected interstate commerce to the risk of multiple taxation; (c) Those in which there was a discriminatory element in that they were directed exclusively "at transportation or communication;" (d) Those in which there was no discrimination but a possible multiple burden; and (e) Those in which there was no discrimination, no apportionment and no possibility of multiple burden.

*Joseph* v. *Carter, etc., Stevedoring Co.,* 330 U. S. 422, 67 S. Ct. 815, 91 L. ed. 993, held invalid a tax on gross income from stevedoring "obviously a 'continuation of the transportation,'" because not "a tax apportioned to income derived from activities within the taxing state;" but it is stated in the opinion that "a proper regard for the authority of the states and their right to require interstate commerce to contribute by taxes to the support of the state governments which make their interstate commerce possible, has led Congress, over a long period to leave intact the judicial rulings, referred to above, that apportioned, non-discriminatory gross receipt taxes or those fairly levied in lieu of property taxes conformed to the requirements of the Commerce Clause."

A New York statute imposed a tax on the gross income of every utility doing business in the State "in addition to any and all other taxes and fees imposed by any other provision of law for the same period." In *Central Greyhound Lines* v. *Mealey,* 334 U. S. 653, 68 S. Ct. 1260, 92 L. ed. 1633, Greyhound contended that since the taxed transportation was interstate commerce it could not be subjected to the tax. The court sustained that contention, on the ground that the tax was unapportioned, but held that the entire tax need not fall, as it might be fairly apportioned to the business done within the State by a fair method of apportionment; that on the record the tax might constitutionally be sustained on the receipts apportioned as to the mileage within the State. The case was therefore remanded for further proceedings. Three justices dissented on the ground that the transportation was intrastate.

Memphis Natural Gas Company, a Delaware corporation,

owned and operated a pipe line which ran through Mississippi from and into other States. It did not engage in intrastate commerce in Mississippi. In addition to *ad valorem* taxes, Mississippi imposed "a franchise or excise tax" based on the value of the capital used, invested or employed within the State. The levy was sustained. The court said that the State court had construed the statute as an exaction required as a recompense for the State's protection of lawful activities, and those local incidents were not the "taxable events" selected for the imposition of the *ad valorem* tax. "These local incidents were the basis for the franchise or excise tax now in controversy. No reason is perceived why Mississippi cannot exact this different tax for the same protection. It is as though the ad valorem rate had been increased." The Chief Justice and three justices dissented. *Memphis Natural Gas Co.* v. *Stone*, 335 U. S. 80, 68 S. Ct. 1475, 1477, 92 L. ed. 1832.

*Interstate Oil Pipe Line Co.* v. *Stone*, 337 U. S. 662, 69 S. Ct. 1264, 93 L. ed. 1163, held valid a tax which the State court had construed to be a tax "merely on the privilege of operating a pipe line wholly within this State as a local activity." Four of the justices held that assuming the business to be interstate commerce as contended, the State had the power to impose the tax; that the statute was not invalid under the Commerce Clause because it imposed a direct tax on the privilege of engaging in interstate commerce, and that any notion to the contrary should not have survived *Maine* v. *Grand Trunk Ry. Co., supra,* which had recently been approved.[2] The rule was repeated that "we

---

[2] One justice concurred in the judgment, solely on the ground that the business was intrastate commerce. The Chief Justice and three justices dissented on the grounds that the business was interstate commerce, that the State court had determined it to be a privilege tax, and that a privilege tax for carrying on wholly interstate transportation, although fairly apportioned, was unconstitutional. But the dissenting justices said:

"Where the corporate taxpayer conducts intrastate as well as interstate business, a franchise privilege or excise tax on the former is of course permissible. We have frequently upheld such a tax although it was measured by property or receipts which were used in or attributable to interstate business."

They further said that *Maine* v. *Grand Trunk Ry. Co., supra,* was inapposite because Interstate Company did a wholly interstate business, and that "Grand Trunk, concerning a tax on the privilege of exercising a franchise in Maine, can only be reconciled with the later cases commented upon at note 15 if Grand Trunk did an intrastate as well as an interstate business. A state franchise tax for that is permissible. See notes 16 and 17, supra. The method of apportionment employed in the Grand Trunk case has had approval as recently as the Greyhound case, 334 U. S. at page 663, 68 S. Ct. 1260, 1266, 92 L. ed. 1633. There was no approval of Grand Trunk in Greyhound as a precedent for a tax on the privilege of doing an interstate business. See 334 U. S. at p. 658, 68 S. Ct. at page 1263, 92 L. ed. 1633."

are concerned with the practical operation of challenged state tax statutes, not with their descriptive labels.''

Two other cases, decided this year, should be noted. *Canton R. Co.* v. *Rogan,* 340 U. S. 511, 71 S. Ct. 447, 95 L. ed. 488, upheld, over objections based on the Import-Export and the Commerce Clauses of the Constitution, a Maryland franchise tax on steam railroad companies, apportioned to the length of their lines within the State. As to the Commerce Clause, the court said:

''The objection to Maryland's tax on the ground that interstate commerce is involved is not well taken. It is settled that a nondiscriminatory gross receipts tax on an interstate enterprise may be sustained if fairly apportioned to the business done within the taxing state, see *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 255, 58 S. Ct. 546, 548, 82 L. ed. 823, and not reaching any activities carried on beyond the borders of the state. Where transportation is concerned, an apportionment according to the mileage within the state is an approved method. *Central Greyhound Lines* v. *Mealey,* 334 U. S. 653, 68 S. Ct. 1260, 1266, 92 L. ed. 1633.''

In *Spector Motor Service* v. *O'Connor,* 340 U. S. 602, 71 S. Ct. 508, 95 L. ed. 573, a Connecticut statute was held invalid which imposed a tax upon the franchise of a foreign corporation for the privilege of doing business within the State, the business consisting solely of interstate commerce, and the tax being at a non-discriminatory rate and fairly apportioned. The court said that the ''all-important 'operating incidence' of the tax '' had been made clear by the holding of the State court, according to which ''It is a 'tax or excise' placed unequivocally upon the corporation's franchise for the privilege of carrying on exclusively interstate transportation in the State.''

The court pointed out that its decision did not conflict with the principle that, ''where a taxpayer is engaged both in intrastate and interstate commerce, a state may tax the privilege of carrying on intrastate business and, within reasonable limits, may compute the amount of the charge by applying the tax rate to a fair proportion of the taxpayer's business done within the state, including both interstate and intrastate.'' Three justices dissented on the ground that the Connecticut tax ''meets every practical test of fairness and propriety enunciated in cases upholding privilege taxes on corporations doing a mixed intrastate and interstate business.''

It is repeated in this case that "It is not a matter of labels. The incidence of the tax provides the answer."

One other case is important to this controversy. *Ott v. Mississippi Val. Barge Line Co.*, 336 U. S. 169, 69 S. Ct. 432, 93 L. ed. 431, involved the validity of *ad valorem* taxes levied by Louisiana and the city of New Orleans under assessments based on the ratio of the mileage in Louisiana to the mileage of the entire line, upon vessels used to transport freight in interstate commerce up and down the Mississippi and Ohio Rivers under certificates issued by the Interstate Commerce Commission. The vessels were within Louisiana only for the comparatively short periods required to discharge and take on cargo and to make necessary and temporary repairs. In holding the tax valid the court said, "We can see no reason which should put water transportation on a different constitutional footing than other interstate enterprises;" that the problem under the Commerce Clause "is to determine 'what portion of an interstate organism may appropriately be attributed to each of the various states in which it functions,'" the requirement being satisfied "if the tax is fairly apportioned to the commerce carried on within the State."

Our problem, therefore, comes down to the question of what kind of tax is levied by section 58-575. If it is an excise tax "placed unequivocally upon the corporation's franchise for the privilege of carrying on exclusively interstate transportation in the State," then it is invalid. But if it is (1) for the privilege of carrying on intrastate business, fairly computed "by applying the tax rate to a fair proportion of the taxpayer's business done within the State, including both interstate and intrastate," it is valid, *Spector Motor Service v. O'Connor, supra;* or (2) if it is in substance and effect a fairly apportioned tax on property, it is valid.

1. The tax is on gross receipts from operations "within this State." That applies, the statute says, to two, and only two, kinds of gross receipts: (a) receipts from business beginning and ending within this State, and (b) receipts *earned in this State* on business passing through, into or out of this State. If the facts and figures clearly show the amount of (b), they control; if not, (b) is ascertained on a mileage basis. There is no contention here that the rate has not been applied to a fair proportion of the taxpayer's business done within this State. It has been agreed, as stated, that the tax has been properly computed.

Clearly the tax applies alike to all water carriers; it is not discriminatory against interstate commerce; no other State can tax the same activity, and we think it satisfies the constitutional requirement that it be not a tax upon the privilege of carrying on an exclusively interstate business, but a tax fairly apportioned to the business carried on within this State, as defined in the Supreme Court decisions, and therefore is a valid tax.

2. Title 58 of the Code, Taxation, provides in chapter 12 thereof, sections 58-503 through 58-685, a system of taxation of public service corporations, including railway and canal companies, express companies, steamship companies, and others. The general pattern of the system is that these companies pay to the locality taxes on real estate and tangible personal property; to the State taxes on intangible personal property and money, and in addition a tax, called a franchise tax in some cases and a license tax in others, measured by gross receipts. Provision is made for apportionment in the case of interstate transportation when necessary. The value of all property for taxation, tangible and intangible, is fixed by the State Corporation Commission.

In the case of steamship companies (and also express companies) the tax is denominated a license tax, and the requirement is that every such company shall pay it "for the privilege of doing business in this State, in addition to the annual registration fee and property tax." But what it is called is not necessarily what it is. It is well settled that the name by which it is called is immaterial; that it is not a matter of labels; that the incidence of the tax provides the answer; that the operation of the statute and not its descriptive label is what governs. *Dawson* v. *Kentucky Distilleries, etc., Co.*, 255 U. S. 288, 41 S. Ct. 272, 65 L. ed. 638; *Interstate Oil Pipe Line Co.* v. *Stone, supra*; *Spector Motor Service* v. *O'Connor, supra*; *Charlottesville* v. *Marks' Shows*, 179 Va. 321, 329, 18 S. E. (2d) 890, 894.

Certainly section 58-575 does not impose a license tax in the sense that its payment is a prerequisite to the right to operate vessels in the navigable waters of the United States. It does not impose a tax on the privilege of navigation. The payment of the tax is not made a condition precedent to the right to carry on the business, as was the case in *Moran* v. *New Orleans*, 112 U. S. 69, 5 S. Ct. 38, 28 L. ed. 653, and *Harman* v. *Chicago*, 147

U. S. 396, 13 S. Ct. 306, 37 L. ed. 216. It provides no criminal sanctions, but its enforcement is left to the ordinary means devised for the collection of taxes. *Postal Tel. Cable Co.* v. *Adams, supra.*

Baltimore has been paying a tax on receipts from business "beginning and ending in Virginia" every year since 1915, but no license has ever been issued to it and the procedures prescribed in Article I, Chapter 7 of Title 58 for obtaining licenses have not been followed. "But where it is exacted solely for revenue purposes and its payment gives the right to carry on the business without any further conditions, it is a tax." *Charlottesville* v. *Marks' Shows, supra,* 179 Va. at p. 329, 18 S. E. (2d) at p. 894.

If not a license tax, is it a tax on property or the equivalent of a tax on property?

In *Richmond* v. *Commonwealth,* 188 Va. 600, 619, 50 S. E. (2d) 654, 663, the opinion of the State Corporation Commission in that case is quoted to the effect that our constitutional and statutory provisions furnish a uniform plan for the assessment and taxation of public service corporations, common to all such companies, and providing for the imposition of *ad valorem* taxes by the several localities in the State, on the basis of assessments or valuations fixed by the Commission. "A second and integral part of the system provides that such companies shall pay a franchise tax measured by gross receipts which tax is devoted to the support of the State government. The constitutional and statutory provisions, providing for this dual method of taxing such companies, uniformly require that the Commission, in making the assessments or fixing the valuations of the tangible properties, must *exclude* such franchise value as may be inherent in such property."

We said in that opinion that the existing method of assessing the properties of the utility involved in that case was developed from the system prescribed for the assessment of railroad properties, and we quoted from a letter relating to railroad assessments written by Commissioner Epes, afterwards a justice of this court, saying in part:

" 'The value of these physical properties, which the Commission has tried to ascertain as the 100% basis to which to relate its assessments, is the actual value as of January 1, 1927, of the land and other physical properties of the railroad company

exclusive of any franchise value, good will, 'going concern value,' 'cost of establishing the business,' or other 'intangible' value of the company.' "

Likewise, in the 1941 Annual Report of the Commission, page 41, it was said:

"Therefore, in making the assessment of the physical properties, we are assessing the tracks, track structures, cuts, fills, tunnels, bridges, and the like, or, in other words, the bare bones of the property, denuded of the intangible elements of value which may be attributable to them. It should also be borne in mind that the franchise value is assessed at 100%."

It thus appears that the physical properties of these appellees, according to this practice, were assessed on the basis of their dual values, the dead value, or "the bare bones," to be taxed by the locality, and the live, or going concern value, to be taxed by the State for the protection and services rendered by it. That the going concern value is thus taxable, although the basic items of property on which it arises are used in interstate commerce, is established by numerous decisions of the Supreme Court, as set out above. This tax on the going concern value is in effect an increase of the *ad valorem* rate, *Memphis Natural Gas Co.* v. *Stone, supra*. In its derivation and substance it is a tax on an element of value of the physical properties not reached by the tax levied by the localities, but reserved to the State and not otherwise taxed. It is, therefore, a tax which is not prohibited by the Commerce Clause.

The majority of the Commission felt bound by the fact that not since 1915, when the present section 58-575 was enacted as section 31 of Chapter 141, pp. 197, 206, Acts, 1915, has the Commission taxed water carriers on receipts from business "passing through, into or out of this State." This has been because in 1915 the Attorney General's office advised the Commission that that feature of the statute was unconstitutional. That opinion was based largely upon the holding of the Supreme Court in *Galveston, etc., R. Co.* v. *Texas, supra,* and *Meyer* v. *Wells, Fargo & Co., supra*. We think, in the light of the broader concept of the power of the States in the field of taxation as reflected by the more recent decisions, that is not a sound interpretation of the statute. Since that opinion the Legislature has re-enacted the statute with the same provision in it at least

six times.[3] That of course is the opposite of a legislative sanction of an administrative procedure. This is not a case of a practical construction of an ambiguous statute by an administrative body over a long period, tacitly accepted by the legislature, and to be given weight by the courts. *Cf. Joyner v. Matthews, ante,* p. 10, 68 S. E. (2d) 127 and *Commonwealth v. Appalachian Elec. Power Co., ante,* p. 37, 68 S. E. (2d) 122, decided today. The practice here has resulted from an opinion received by the Commission that the statute was unconstitutional. That is purely a legal question which we now have the duty to decide. As the practice is contrary to the direction of a valid statute, as we hold, there is no reason against now correcting it.

The orders of the Commission are reversed and the cases remanded for further proceedings consistent herewith.

*Reversed and remanded.*

---

[3] Acts 1926, p. 955; Acts 1928, § 222, p. 153; Acts 1936, p. 534; Acts 1938, p. 412; Acts 1944, p. 110; Acts 1948, p. 924.