# Richmond

## J. Lindsay Almond, Jr., Attorney General of Virginia v. Sidney C. Day, Jr., Comptroller of Virginia.

November 7, 1955.   (Extra Session)

Record No. 4491.

Present, All the Justices.

The opinion states the case.

*J. Lindsay Almond, Jr., Attorney General; Kenneth C. Patty, Assistant Attorney General* and *Robert D. McIlwaine, III, Assistant Attorney General,* for the petitioner.

*Hardy C. Dillard, Lindsey Cowen* and *F. D. G. Ribble,* for the respondent.

EGGLESTON, J., delivered the opinion of the court.

This is a petition for a writ of mandamus filed by the Attorney General of Virginia to determine the validity of Item 210 of the Appropriation Act of 1954 (Acts of Assembly 1954, ch. 708, p. 970) which appropriates funds for the "education of orphans of soldiers, sailors and marines" who were citizens of Virginia and were "killed in action or died, or who are totally and permanently disabled as a result of service during the World War."

In September, 1955, the Superintendent of Public Instruction contemplated presenting to the Hon. Sidney C. Day, Jr., State Comptroller, approved vouchers authorizing the payment of certain funds appropriated by Item 210 of the Appropriation Act to the parents, guardians, or other persons having custody of children attending public and private institutions and eligible for benefits under the Act. The State Comptroller forwarded to the Attorney General, in writing, an expression of his doubt of the validity of such payments, in view of Section 141 of the State Constitution, and notifying him that he would decline to make them until there was a final adjudication of their validity by this court,

Pursuant to the provisions of Code, § 8-714, the Attorney General filed in this court a petition for a writ of mandamus directing the State Comptroller to issue warrants upon the State Treasurer for the payment of such amounts as are authorized by vouchers approved by the Superintendent of Public Instruction. The petition alleged that the proposed payments were not prohibited by Section 141 of the State Constitution.

The respondent State Comptroller filed an answer admitting the allegations of fact in the petition, but expressing the view that he should not make such payments until it had been adjudicated whether the appropriation contravened Section 141 of the State Constitution, and also Sections 16, 58 and 67 of that Constitution, and the Fourteenth Amendment to the Federal Constitution.

The text of Item 210 of the Appropriation Act of 1954 is copied in the margin.[1] This Act is the outgrowth of prior acts providing

---

[1] "Item 210

"For the education of orphans of soldiers, sailors and marines who were killed in action or died, or who are totally and permanently disabled as a result of service during the World War.............................................................$12,000

"It is provided that the sum hereby appropriated shall be expended for the sole purpose of providing for tuition, institutional fees, board, room rent, books and supplies, at any educational or training institution of collegiate or secondary grade in the State of Virginia, approved in writing by the Superintendent of Public Instruction, for the use and benefit of the children not under sixteen and not over twenty-five years of age either of whose parents was a citizen of Virginia at the time of entering war service and was killed in action or died from other causes in World War I extending from April 6, 1917, to July 2, 1921, or in any armed conflict subsequent to December 6, 1941, while serving in the army, navy, marine corps, air force or coast guard of the United States, either of whose parents was, or is, or may hereafter become totally and permanently disabled due to such service during either such period, whether such parents be now living or dead.

"Such children, upon recommendation of the Superintendent of Public Instruction, shall be admitted to State institutions of secondary or college grade, free of tuition.

"The amounts that may be, or may become, due hereunder by reason of attendance at any such educational or training institution, not in excess of the amount specified hereinafter, shall be payable from this appropriation hereby authorized on vouchers approved by the Superintendent of Public Instruction.

"The Superintendent of Public Instruction shall determine the eligibility of the children who may make application for the benefits provided for herein; and shall satisfy himself of the attendance and satisfactory progress of such children at such institutions and of the accuracy of the charge or charges submitted on account of the attendance of any such children at any such institution, provided, that neither said Superintendent nor any member of the State Board of Education, nor any official or agent or employee thereof, shall receive any compensation for such services.

"Not exceeding four hundred dollars shall be paid hereunder for any one child for any one school year; and no child may receive benefits of this or similar ap-

benefits for orphans of soldiers, sailors and marines who entered the military service from Virginia. The first of these was the Act of 1930, ch. 375, p. 810, providing educational opportunities for the orphans of such veterans who were killed in action or died during World War I. The 1930 Act provided for the payment of "matriculation fees, board and room rent and books and supplies for the use and benefit of" such children who were attending or might attend "a State educational or training institution of secondary or college grade."

The 1930 Act was carried in Michie's Code of 1936 as sections 2672b, 2672c and 2672d. As amended[2] it was carried in the Code of 1950 as section 23-7.1. In 1952 this section was amended to provide for the payment of such matriculation fees, board and room rent and books and supplies "at any educational or training institution of collegiate or secondary grade in the State of Virginia approved in writing by the Superintendent of Public Instruction." This last amendment limited the amount of such expenditures to "such funds as shall be appropriated for the purpose in the general appropriation acts." (Acts 1952, ch. 83, p. 100.)

In the meantime by provisions in the several appropriation acts the benefits for eligible children of Virginia veterans had been broadened beyond the provisions of the 1930 Act. In the Appropriation Act of 1932 (Acts 1932, ch. 147, p. 193) provision was made for the payment of matriculation fees, board and room rent, books and supplies "at any educational institution in the State of Virginia approved in writing by the superintendent of public instruction."

In substantially the same language funds to provide educational opportunities for the orphans of soldiers, sailors and marines from Virginia who were killed or who died in World Wars I and II, were

---

propriations for a total of more than four school years.

"This amendment shall not operate to divest any such child of any such scholarship now holding any such scholarship under this act except that the four-year limitation herein provided for shall apply to any scholarship heretofore issued." (Acts 1954, ch. 708, p. 970.)

[2] Acts of 1940, ch. 369, p. 650, which extended the provisions of the section to children of veterans who were, or are, or may hereafter become, totally and permanently disabled due to service during the World War, whether such veterans be now living or dead.

Acts of 1944, ch. 83, p. 109, which extended the benefits to the orphans of those from Virginia who served in World War II.

appropriated for each succeeding biennium.[3] The 1950 Appropriation Act (Acts 1950, ch. 578, p. 1377, Item 129) enlarged the declared purposes by providing for the payment of "tuition, institutional fees, board, room rent, books and supplies," in place of the former provision for the payment of "matriculation fees, board and room rent, books and supplies." This provision was repeated in the 1952 Act (Acts 1952, ch. 716, p. 1223, Item 203) and in Item 210 of the 1954 Acts (Acts 1954, ch. 708, p. 970).

It thus appears that the provision in Item 210 of the 1954 Appropriation Act for the payment of tuition, institutional fees, etc., of eligible children "at any educational or training institution of collegiate or secondary grade in the State of Virginia, approved in writing by the Superintendent of Public Instruction," is by force of its broad language made available for use while such children are attending either sectarian or nonsectarian private schools.

Section 141 of the Constitution of Virginia, as amended in 1952, reads thus:

*"State appropriations prohibited to schools or institutions of learning not owned or exclusively controlled by the State or some subdivision thereof; exceptions to rule.*—No appropriation of public funds shall be made to any school or institution of learning not owned or exclusively controlled by the State or some political subdivision thereof; provided, first, that the General Assembly may appropriate funds to an agency, or to a school or institution of learning owned or controlled by an agency, created and established by two or more States under a joint agreement to which this State is a party for the purpose of providing educational facilities for the citizens of the several States joining in such agreement; second, that counties, cities, towns and districts may make appropriations to nonsectarian schools of manual, industrial, or technical training, and also to any school or institution of learning owned or exclusively controlled by such county, city, town, or school district."

■ The first question presented is whether the provisions of this section of the Constitution prohibit the payments authorized by

---

[3] Acts of 1934, ch. 358, p. 593
Acts of 1936, ch. 422, p. 845
Acts of 1938, ch. 428, p. 893
Acts of 1940, ch. 425, p. 790
Acts of 1942, ch. 475, p. 803, Item 103
Acts of 1944, ch. 407, p. 688, Item 114
Acts of 1946, ch. 388, p. 817, Item 122
Acts of 1948, ch. 552, p. 1173, Item 129

Item 210 of the Appropriation Act for tuition, institutional fees and other designated expenses of eligible children attending private schools.

The argument of the petitioner Attorney General runs thus: Section 141, being a restraint on the plenary power of the General Assembly, must be strictly construed; the express language of the section merely prohibits a *direct* "appropriation of public funds" *to* "any school or institution of learning not owned or exclusively controlled by the State or some political subdivision thereof;" Item 210 is not an appropriation *directly to* the institutions which the eligible children may attend, but is an appropriation to the parents or guardians of such children, is primarily for the benefit of such children, and only incidentally for the benefit of the selected private schools. Hence, it is said, the appropriation is "not antagonistic either to the letter or spirit of Section 141."

The position of the respondent State Comptroller is that the constitutionality of a statute is to be tested by its normal effect and the practical consequences to which it leads; that the provision for the payment of tuition, institutional fees and other designated expenses at a private school, to be attended by children eligible under the Act, is a direct and substantial aid to such institution, and falls within the inhibition of Section 141 which was designed to prohibit such diversion of public funds from the public school system to the aid or benefit of private schools.

Section 141 is found in Article IX of our Constitution embracing the provisions for "Education and Public Instruction." Section 129, the first of these provisions, provides that "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State." The other sections in Article IX make provision for the establishment and maintenance of such system. Among these is Section 141 which insures that public funds raised by taxation will be under the exclusive control of public authorities, used for the benefit of the public schools, and that no part thereof will be diverted from that purpose to private schools.

It will be observed that the prohibition in Section 141 is in broad and inclusive language. It says, "*No appropriation* of public funds shall be made to *any school or institution of learning* not owned or exclusively controlled by the State or some political subdivision thereof" (italics supplied), with two provisos or exceptions then spelled out. The effect is thus to prohibit all appropriations

of public funds to institutions of learning other than those expressly permitted. The prohibition is against any or all aid to the excluded institutions.

The Record of the Debates of the Constitutional Convention of 1901-02 during the framing and adoption of Section 141 shows that its dominant purpose was to aid and maintain the public free school system and to guard against any diversion of public school funds from that purpose.

The first sentence of the section as originally reported by the Committee on Education and Public Instruction prohibited appropriations of public funds to any school or institution of learning "not owned and exclusively controlled" by the State or some political subdivision thereof. (Debates, Constitutional Convention, Vol. 1, p. 1019.) During the debates the phrase "not owned *and* exclusively controlled" (italics supplied) was broadened to read, "not owned *or* exclusively controlled" (italics supplied) to conform to the wording in what is now Section 67 of the Constitution, limiting appropriations to charitable and other institutions. (Debates, Constitutional Convention, Vol. 1, p. 1239.) There is no suggestion in the debates that the opening sentence of Section 141 was intended, as the petitioner argues, merely to prohibit *direct* aid *to* such institutions, and, by implication, to permit *indirect* aid to them.

The section as adopted by the Convention is printed in the margin.[4] The main debate centered around the three provisos which related to permitted appropriations, (1) To the College of William and Mary, which was not then a State institution; (2) For the payment of interest on bonds held by certain schools and colleges; and (3) By political subdivisions to certain schools. (Debates, Constitu-

---

[4] "Sec. 141. *State appropriations prohibited to schools or institutions of learning not owned or exclusively controlled by State or some subdivision thereof; exceptions to rule.*

"No appropriation of public funds shall be made to any school or institution of learning not owned or exclusively controlled by the State or some political subdivision thereof; provided, first, that the General Assembly may, in its discretion, continue the appropriations to the College of William and Mary; second, that this section shall not be construed as requiring or prohibiting the continuance or discontinuance by the General Assembly of the payment of interest on certain bonds held by certain schools and colleges as provided by an act of the General Assembly, approved February twenty-third, eighteen hundred and ninety-two, relating to bonds held by schools and colleges; third, that counties, cities, towns, and districts may make appropriations to nonsectarian schools of manual, industrial, or technical training, and also to any school or institution of learning owned or exclusively controlled by such county, city, town, or school district."

tional Convention, Vol. 1, pp. 1239-1244.)

Webster's New International Dictionary, 2d Ed., defines the transitive verb "to appropriate" as, "To set apart for, or assign to, a particular purpose or use, in exclusion of all others; — — with *to* or *for*; as, to *appropriate* money for the navy, or a piece of ground for a garden." The same authority defines "appropriation" as, "Money set apart by formal action to a specific use."

■ Giving the words their commonly accepted meaning, "to appropriate to" means "to appropriate for the benefit of" a specific purpose, and none other. Hence, the prohibition in Section 141 against an appropriation "to" any school not under public control means that no money can be lawfully appropriated "for the benefit of" that school.

A glance at the 1954 Appropriation Act will show that appropriations are not usually made directly "to" the various beneficiaries, whether they be State educational institutions or State departments. They are stated to be "for" a specific purpose; for example, "For maintenance and operation of" the particular educational institution, or "for" some specific purpose at the institution, or "For expenses of administration" of a department of the State. But no one would question that these appropriations are in effect "to" these institutions and departments in the sense that they are "set apart" for their use.

Similarly the appropriation in Item 210, now before us, for the purpose of "providing for tuition, institutional fees," etc., at private schools to be approved by the Superintendent of Public Instruction, is an appropriation for the benefit of such schools. The fact that in the administration of the Act the funds may be paid to the parents or guardians of the children and not directly to the institutions does not alter their underlying purpose and effect. As a matter of fact the record shows that from July, 1950, through June, 1954, payments of these appropriations have usually been made directly to the institutions.

It is urged that we should apply the reasoning of certain recent cases which have validated appropriations for transportation of children to private schools, and the furnishing of textbooks for the use of children at such schools, upon the theory that such aid is primarily for the benefit of the children and only incidentally for the benefit of the institutions involved. Typical of these is *Everson* v. *Board of Education*, 330 U. S. 1, 67 S. Ct. 504, 91 L. ed. 711, in which the Supreme Court in a 5 to 4 decision held that a New

Jersey statute authorizing school district boards to provide for the transportation of pupils to and from parochial schools was not violative of the "establishment of religion" clause of the Federal Constitution.[5]

Upon the same theory *Borden* v. *Louisiana State Board of Education*, 168 La. 1005, 123 So. 655, 67 A. L. R. 1183, relied upon by the petitioner, validated the expenditure of public funds to provide free school books to pupils at private schools against a constitutional provision similar to Section 141 in the Virginia Constitution.[6] The crux of that case, as stated in the court's opinion, is that "The schools, however, are not the beneficiaries of these appropriations. They *obtain nothing from them*, nor are they relieved of a single obligation, because of them. The school children and the state alone are the beneficiaries." (Italics supplied.) 123 So., at pages 660, 661.

Clearly such reasoning does not apply to the appropriation here under consideration. Assuming, but not deciding, the soundness of the view that the private institutions involved receive no direct benefit from the transportation of pupils or the furnishing of textbooks to them, the same cannot be said of provisions for the payment of tuition and institutional fees at such schools. Tuition and institutional fees go directly to the institution and are its very life blood. Such items are the main support of private schools which are not sufficiently endowed to insure their maintenance. Surely a payment by the State of the tuition and fees of the pupils of a private school begun on the strength of a contract by the State to do so would be an appropriation to that school.

Furthermore, the argument that the appropriation in Item 210 is not for the benefit of private schools is entirely inconsistent with the concession in petitioner's reply brief that, "tuition paid for the benefit of a child attending a *secretarian* school would undoubtedly violate the 1st Amendment of the Constitution of the United States as incorporated into the 14th Amendment. The trend of recent

---

[5] For the contrary view that furnishing transportation to pupils attending private or sectarian schools is an aid in maintenance of schools, see *Judd* v. *Board of Education, etc., Dist.*, 278 N. Y. 200, 15 N. E. (2d) 576, 118 A. L. R. 789; *State ex rel. Traub* v. *Brown*, 6 W. W. Harr. (36 Del.) 181, 172 A. 835; *Gurney* v. *Ferguson*, 190 Okl. 254, 122 P. (2d) 1002; *Visser v. Nooksack Valley School Dist.*, 33 Wash. (2d) 699, 207 P. (2d) 198.

[6] For the contrary view that furnishing textbooks to children who attend private schools is an aid in the maintenance of such schools, see *Smith* v. *Donahue*, 202 App. Div. 656, 195 N. Y. S. 715; *Haas* v. *Independent School Dist.*, 69 S. D. 303, 9 N. W. (2d) 707.

U. S. Supreme Court decisions and decisions in other foreign jurisdictions strongly indicates this. Those decisions further indicate the strong possibility that the provisions of the Virginia Constitution dealing with separation of Church and State would also be construed as prohibiting the type of appropriation here under consideration."

The basis of this concession is that the payment of such tuition would directly benefit and support a *sectarian* school contrary to the purpose and spirit of these constitutional provisions. The same principle would, of course, apply to the payment of tuition at a private *nonsectarian* school. In both cases the parent or guardian to whom the tuition fees are paid is merely the conduit or channel through whom the aid from the State to the school is transmitted. Such natural and reasonable effect of the appropriation is proof of its invalidity.

"The general rule is that in whatever language a statute may be framed, its purpose and its constitutional validity must be determined by its natural and reasonable effect. * * *" 11 Am. Jur., Constitutional Law, § 101, p. 735, and cases there cited. See also, *Commonwealth* v. *Baltimore Steam Packet Co.*, 193 Va. 55, 68, 68 S. E. (2d) 137, 146.

When we consider the natural, reasonable and realistic effect of the provision in Item 210 for the payment of tuition, institutional fees and other designated expenses of eligible children who attend private schools approved by the Superintendent of Public Instruction, we are forced to the conclusion that it constitutes a direct and substantial aid to such institutions and falls within the prohibition of Section 141 of our Constitution.

█ We further agree with the position of counsel for the respondent State Comptroller that in so far as Item 210 purports to authorize payments for tuition, institutional fees and other designated expenses of eligible children who attend *sectarian* schools, it falls within the prohibitions of Sections 16, 58 and 67 of the Constitution of Virginia and the First and Fourteenth Amendments to the Federal Constitution.

Section 16 provides:

"*Religious freedom.*—That religion or the duty which we owe to our creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence and, therefore, all men are equally entitled to the free exercise of re-

ligion, according to the dictates of conscience and that it is the mutual duty of all to practice Christian forbearance, love and charity towards each other."

Section 58, so far as here pertinent, reads as follows:

"*Prohibitions on General Assembly as to suspension of writ of habeas corpus, and enactment of laws referring to religion and other laws.*— * * * No man shall be compelled to frequent or support any religious worship, place, or ministry, whatsoever, * * * . And the General Assembly shall not * * * pass any law requiring or authorizing any religious society, or the people of any district within this State, to levy on themselves, or others any tax for the erection or repair of any house of public worship, or for the support of any church or ministry; but it shall be left free to every person to select his religious instructor, and to make for his support such private contract as he shall please."

Section 67 provides:

"*Limitations on appropriations by General Assembly to charitable and other institutions; exceptions.*—The General Assembly shall not make any appropriation of public funds, or personal property, or of any real estate, to any church, or sectarian society, association, or institution of any kind whatever, which is entirely or partly, directly or indirectly, controlled by any church or sectarian society; nor shall the General Assembly make any like appropriation to any charitable institution which is not owned or controlled by the State; except that it may, in its discretion, make appropriations to non-sectarian institutions for the reform of youthful criminals; but nothing herein contained shall prohibit the General Assembly from authorizing counties, cities, or towns to make such appropriations to any charitable institution or association."

These provisions in our basic law guarantee freedom of religion and complete separation of Church and State in civil affairs.

The First Amendment to the Federal Constitution provides that, "Congress shall make no law respecting an establishment of religion, * * * ."

It has been settled by the decisions of the Supreme Court that the Due Process Clause of the Fourteenth Amendment "has rendered the legislatures of the states as incompetent as Congress to enact such laws." *Cantwell* v. *State of Connecticut,* 310 U. S. 296, 303, 60 S. Ct. 900, 903, 84 L. ed. 1213, 128 A. L. R. 1352. See

also, *Everson* v. *Board of Education, supra,* 330 U. S., at page 15, 67 S. Ct., at page 511.

The payment of such items to sectarian schools as directed or authorized by the terms of Item 210 is unconstitutional because, (1) It utilizes public funds to support religious institutions contrary to the principles laid down in *Everson* v. *Board of Education, supra,* 330 U. S., at page 16, 67 S. Ct., at page 511; (2) It "affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the state's compulsory public school machinery," condemned in *McCollum* v. *Board of Education,* 333 U. S. 203, 212, 68 S. Ct. 461, 466, 92 L. ed. 649; (3) It compels taxpayers to contribute money for the propagation of religious opinions which they may not believe. See *Protestant Episcopal Education Society* v. *Churchman's Representatives,* 80 Va. 718, 775; *Jones* v. *Commonwealth,* 185 Va. 335, 344, 345, 38 S. E. (2d) 444, 448.

■ Indeed, as has been said, the reply brief of the Attorney General concedes that the payment of tuition for the benefit of a child attending a sectarian school violates these provisions of the State and Federal Constitutions. But he insists that since that issue was not raised in his petition it is not properly before us. We agree with counsel for the State Comptroller that the issue is before us.

While Code, § 8-714, under which this proceeding was instituted, requires this court to "consider and determine all questions raised by the Attorney General's petition pertaining to the constitutionality or interpretation of any such act," it does not preclude our consideration of other constitutional questions which may be presented to us. In his answer the respondent State Comptroller raised the question as to whether Item 210 contravened Sections 16, 58 and 67 of the State Constitution and the Fourteenth Amendment to the Federal Constitution.

Aside from this, we have repeatedly held that the unconstitutionality of a law need not be specially pleaded and may be raised for the first time in this court. *Adkins* v. *City of Richmond,* 98 Va. 91, 92, 34 S. E. 967, 47 L. R. A. 583, 81 Am. St. Rep. 705; *Burnette* v. *Commonwealth,* 194 Va. 785, 786, 75 S. E. (2d) 482, 483, and cases there cited.

In *City of Portsmouth* v. *Weiss,* 145 Va. 94, 133 S. E. 781, we said: "Whenever a statute is enforced by a judgment or decree of a court, it is a judicial determination that the statute is a valid enactment and is free from *all constitutional objections.* If unconstitu-

tional for any reason, whether assigned or not, the statute is void." (145 Va., at page 103.) See also, *Miller* v. *State Entomologist*, 146 Va. 175, 180, 135 S. E. 813, 67 A. L. R. 197; *Board of Supervisors* v. *State Milk Commission*, 191 Va. 1, 11, 60 S. E. (2d) 35, 40; *Edwards* v. *Commonwealth*, 191 Va. 272, 285, 286, 60 S. E. (2d) 916, 922.

To sustain the validity of Item 210, in so far as it purports to authorize payments for tuition, institutional fees and other designated expenses of eligible children who attend private schools, in the face of the constitutional provisions which have been discussed, would mean that by like appropriations the General Assembly might divert public funds to the support of a system of private schools which the Constitution now forbids. If that be a desirable end, it should be accomplished by amending our Constitution in the manner therein provided. It should not be done by judicial legislation.

Since, in our opinion, Item 210 is unconstitutional and void to the extent that it purports to authorize payments for tuition, institutional fees and other designated expenses of eligible children who attend approved or designated private schools, the writ prayed for is denied.

*Writ denied.*