# Richmond

Andrew P. Miller, Attorney General of Virginia v. David B. Ayres, Jr., Comptroller of Virginia.

September 1, 1972.

Record Nos. 8009 and 8010.

Present, Snead, C.J., I'Anson, Carrico, Harrison, Cochran and Harman, JJ.

*Andrew P. Miller, Attorney General; William G. Broaddus, Assistant Attorney General (D. Patrick Lacy, Jr., Assistant Attorney General,* on brief), for petitioner in Record Nos. 8009 and 8010.

*Francis C. Lee (McCaul, Grigsby & Pearsall,* on brief), for respondent in Record Nos. 8009 and 8010.

*Amicus Curiae: A. E. Dick Howard (Charles P. Light, Jr.,* on brief), for petitioner in Record Nos. 8009 and 8010.

HARMAN, J., delivered the opinion of the court.

These petitions were filed by the Attorney General against the Comptroller under Code § 8-714 to determine the validity of Chapters 18 and 19 of the Acts of Assembly of 1972,[1] sometimes hereafter

---

[1]

CHAPTER 18

*An Act to amend the Code of Virginia by adding in Title 23 a chapter numbered 4.1 containing sections numbered 23-38.11 through 23-38.19, relating to tuition assistance loans at private institutions.*

[S 77]

Approved March 9, 1972

Whereas, the General Assembly finds it to be in the public interest and essential to the welfare and well-being of the residents of the Commonwealth and to the proper growth and development thereof, for the Commonwealth to foster and provide financial assistance to its bona fide residents, who are properly qualified for, and who desire to pursue their education beyond the high school level at private, accredited and nonprofit institutions of collegiate education in the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education; and

Whereas, the Commonwealth, by appropriations from the General Fund of the State treasury, assumes a major part of the expense of educating bona fide residents of Virginia attending public colleges therein; and

Whereas, bona fide residents of the Commonwealth, who elect to bear a major portion of the cost of their education, and evidence the same by attendance at one of the aforesaid private institutions, thereby relieve the Commonwealth of the costs which would otherwise be entailed by the attendance of such residents at public colleges therein; now, therefore,

Be it enacted by the General Assembly of Virginia:

1. That the Code of Virginia be amended by adding in Title 23 a chapter numbered 4.1 containing sections numbered 23-38.11 through 23-38.19 as follows:

referred to as the Acts. The proceedings were instituted when the

## CHAPTER 4.1

§ 23-38.11. This chapter may be cited as the Tuition Assistance Loan Act.

§ 23-38.12. There is hereby established, from funds provided by law, a program of tuition assistance in the form of loans, as hereinafter provided, to bona fide residents of Virginia who attend private, accredited and nonprofit institutions of collegiate education in the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education.

§ 23-38.13. The State Council of Higher Education is hereby designated as the administering agency for the program established by this chapter, and authorized to promulgate regulations consistent therewith and appropriate to the administration of the program.

§ 23-38.14. The amount of tuition assistance, in the form of a loan pursuant to this chapter, which shall be available annually to a bona fide resident of Virginia attending a qualified private institution, as described in § 23-38.12, shall not exceed in amount the annual average appropriation per full time equivalent student for the previous year from the General Fund of the State treasury for operating costs at two and four year public institutions of collegiate education in Virginia.

§ 23-38.15. (a) Under this program, loans shall be made to eligible Virginia residents for the academic term for which they enroll and pay tuition at a qualified private institution, as described in § 23-38.12, and shall be repayable in academic work, or in money.

(b) Repayment in academic work shall be satisfied if at the end of the academic term for which the loan is made the student shall have made satisfactory academic progress in his prescribed course.

(c) The loan of any recipient who has not made satisfactory academic progress during the academic term for which the loan is made, shall be due forthwith at the end of said term and shall be repayable in money and collectible as with any other monetary obligation due the Commonwealth.

(d) Whether a recipient, who is compelled to withdraw from an institution during the academic year, in order to perform military service, or for emergency or other meritorious reasons, shall be obligated to repay the loan in money shall be determined by the administering agency on a basis consistent with the principles applied by the public institutions described in § 23-38.14 in making tuition refunds on comparable cases of withdrawal.

§ 23-38.16. A student's eligibility for tuition assistance under this program shall be limited to a total of four academic· years. Tuition assistance under this program shall be used·only for undergraduate collegiate work.

§ 23-38.17. Tuition assistance received by a student under this program shall not be reduced by the receipt by such student of other assistance from any source.

§ 23-38.18. The meaning of the italicized words appearing in this section shall be determined in accordance with the stated method or definition:

(a) For the purposes of this chapter, whether a student is a *bona fide resident of Virginia* shall be determined by the administering agency on a basis consistent with the principles applied by the public.institutions described in § 23-38.14 in determining whether a student is a bona fide resident of Virginia so as to qualify for the Virginia resident tuition fee.

(b) The term *satisfactory academic progress* as used in this chapter shall be evidenced·by (1) the completion of a prescribed course of undergraduate study and the award of the appropriate undergraduate degree in recognition of the completion of such course of study; or, (2) the eligibility of the student to continue his pre-

Comptroller, in letters to the Attorney General, expressed doubt as to the validity of certain provisions of the Acts.

scribed course of study in a succeeding term at the same institution in accord with the academic and administrative rules which said institution applies generally in determining whether a student's performance entitles him to return for a succeeding term.

§ 23-38.19. The provisions of this chapter shall be severable, and if any of its provisions shall be held unconstitutional by a court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions.

---

CHAPTER 19

*An Act to amend the Code of Virginia by adding in Title 23 a chapter numbered 4.1, containing sections numbered 23-38.11 through 23-38.20, creating the Virginia Grant and Loan Commission; assigning powers and duties thereto; and to appropriate funds.*

[S 434]

Approved March 9, 1972

Be it enacted by the General Assembly of Virginia:

1. That the Code of Virginia be amended by adding in Title 23 a chapter numbered 4.1, containing sections numbered 23-38.11 through 23-38.20, as follows:

Chapter 4.1

Virginia Grant and Loan Commission

§ 23-38.11. There is hereby created the Virginia Grant and Loan Commission, hereinafter referred to as the Commission. The Commission shall be composed of seven members from the State at large, appointed by the Governor as follows: of the members first appointed, two shall be appointed for terms of two years, two for terms of three years, and three for terms of four years; subsequent appointments shall be for terms of four years, except appointments to fill vacancies, which shall be for the unexpired terms. No member shall be eligible to serve more than two successive four-year terms. Members of the Commission shall receive no compensation for their services, but shall be paid their necessary expenses incurred in the discharge of their duties. The Commission shall annually elect its own Chairman from among its membership.

§ 23-38.12. The Commission is authorized, subject to the provisions of Chapter 10 of Title 2.1 of the Code of Virginia, to employ a director and such other staff members as it may deem necessary, and is further authorized to accept and expend gifts and donations from public and private sources to enable it better to carry out its programs and objectives.

§ 23-38.13. The Commission shall develop and administer a Statewide program of financial aid to undergraduate students at the institutions of higher education in Virginia. Such aid shall be made in the form of grants or loans to students who wish to enroll, or are enrolled, at any accredited degree-granting public or private nonprofit nonsectarian institution of higher education in Virginia, and in the form of loans for students who wish to enroll, or are enrolled, in any accredited degree-granting private nonprofit sectarian institution of higher education, excepting those institutions whose primary purpose is religious or theological education. Only students who are bona fide residents of Virginia as defined by § 23-7 shall be eligible to receive such grants or loans. Awards shall be made for one year, but may be renewed annually by the Commission for no more than three subsequent years of

## Chapter 18 and Chapter 19 are designed to implement the provisions

study in an undergraduate degree program. The initial awards shall be made to students for the nineteen hundred seventy-three through seventy-four academic year.

§ 23-38.14. (a) Loans shall be repayable in academic work, or in money.

(b) Repayment in academic work shall be satisfied if at the end of the academic term of which the loan is made the student shall have made satisfactory academic progress in his prescribed course.

(c) The loan of any recipient who has not made satisfactory academic progress during the academic term for which the loan is made, shall be due forthwith at the end of said term and shall be repayable in money and collectible as with any other monetary obligation due the Commonwealth.

(d) Whether a recipient, who is compelled to withdraw from an institution during the academic year, in order to perform military service, or for emergency or other meritorious reasons, shall be obligated to repay the loan in money shall be determined by the administering agency on a basis consistent with the principles applied by the public institutions in making tuition refunds on comparable cases of withdrawal.

§ 23-38.15. (a) The Commission shall promulgate rules and regulations covering applications for grants and loans, and shall determine and publish annually the criteria upon which such awards will be based. Such criteria shall be applied on a Statewide basis, without regard to the geographic area of the State in which the applicant resides or to the institutions at which he has chosen to enroll, and shall include a consideration of the applicant's academic ability and financial need, and the cost of attendance at the institution of his choice.

(b) The Commission may by regulation require applicants to furnish such reasonable evidence of academic ability and financial need as is deemed necessary to facilitate a determination thereof.

(c) The rules and regulations of the Commission and the annually published criteria for making awards shall be distributed to each accredited degree-granting institution of higher education and secondary school in the State.

§ 23-38.16. (a) The Commission shall determine the amount of grant or loan to be awarded to each qualified applicant in accordance with the criteria established under subsection (a) of § 23-38.15, but no award shall exceed one thousand dollars per full-time academic year.

(b) The amount awarded to each applicant shall be for payment of charges for tuition, fees, room, board or other educational expenditures approved by the Commission.

§ 23-38.17. In planning the distribution of awards of grants or loans for an academic year, the Commission shall project the average award to be one-half of the maximum award allowable under § 23-38.16.

§ 23-38.18. The Commission shall publish annually a list of educational institutions approved for the enrollment of students receiving grants or loans pursuant to this chapter. Such list shall be distributed to each accredited secondary school in the State.

§ 23-38.19. Not less than thirty days before the convening of each regular session of the General Assembly held in an even-numbered year, the Commission shall make a report to the Governor and the General Assembly setting forth the number and amount of grants or loans awarded, the criteria used in making awards, information on the academic progress of students aided by the Commission, and such other matters as the Commission deems relevant.

§ 23-38.20. Nothing contained in this chapter shall be deemed to limit the authority of any other agency of the State to administer existing programs of financial aid to students as provided by law.

of Article VIII, Section 11 of the Constitution of 1971.[2] Each Act has as a purpose the appropriation of money from the General Fund for financial aid to undergraduate students at institutions of higher education in Virginia.

Chapter 18 provides for a program of tuition assistance in the form of loans to residents of Virginia who attend private, accredited and nonprofit institutions of collegiate education in Virginia whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education, the program to be administered by the State Council of Higher Education. Chapter 18 restricts the aid to tuition assistance in the form of *loans*, while Chapter 19 provides financial aid to be made in the form of *grants* or *loans* to students who wish to enroll, or are enrolled, in any accredited degree-granting public or private nonprofit, nonsectarian institution of higher education in Virginia, and in the form of *loans* for students who wish to enroll, or are enrolled, in any accredited degree-granting private, nonprofit, *sectarian* institution of higher education, excepting those institutions whose primary purpose is religious or theological education.

Both Acts provide for the repayment of loans in academic work or in money. Repayment in academic work shall occur if, at the end of the academic term for which the loan is made, the student shall have made satisfactory academic progress in his prescribed course. Chapter 18 provides that the term "satisfactory academic progress" shall be evidenced by (1) the completion of a prescribed course of undergraduate study and the award of the appropriate undergraduate degree in recognition of the completion of such course of study; or (2) the eligibility of the student to continue his pre-

2. There is hereby appropriated from the general fund of the State treasury the sum of ten thousand dollars to be awarded in loans or grants pursuant to this chapter.

3. There is hereby appropriated from the general fund of the State treasury the sum of twenty-five thousand dollars for the nineteen hundred seventy-two through seventy-four biennium, to be expended by the Commission for operating costs in administering this program.

[2]Section 11. Aid to nonpublic higher education.

The General Assembly may provide for loans to students attending nonprofit institutions of higher education in the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education. The General Assembly may also provide for a state agency or authority to assist in borrowing money for construction of educational facilities at such institutions, provided that the Commonwealth shall not be liable for any debt created by such borrowing.

scribed course of study in a succeeding term at the same institution in accordance with the academic and administrative rules which said institution applies generally in determining whether a student's performance entitles him to return for a succeeding term. Chapter 19 does not define "satisfactory academic progress."

Both Acts provide that the loan of any recipient who has not made satisfactory academic progress during the academic term for which the loan is made shall be due forthwith at the end of the term and repayable in money. Both Acts provide that where a recipient is compelled to withdraw from an institution during the academic year in order to perform military service, or for emergency or other meritorious reasons, his obligation to repay the loan in money shall be determined by the administering agency on a basis consistent with the principles applied by the public institutions of higher education in making tuition refunds in comparable cases of withdrawal.

Chapter 19 directs the Virginia Grant and Loan Commission to promulgate rules and regulations covering applications for grants and loans, to determine the criteria upon which awards will be based, and to require applicants to furnish such reasonable evidence of academic ability and financial need as is deemed necessary.

Both Acts have been funded by appropriations contained in Chapter 804 of the Acts of Assembly of 1972.

The Comptroller argues that both Acts are invalid because:

(1) the assistance provided by the Acts to students in the form of loans repayable in academic work contravenes the limitations placed upon the power of the General Assembly of Virginia in Section 11 of Article VIII, thereby violating Article I, Section 16, Article IV, Section 16, Article VIII, Section 10, and Article X, Section 8 of the Constitution of Virginia, as well as the First and Fourteenth Amendments to the Constitution of the United States; and

(2) the provisions of the Acts authorizing loans to students who may be attending sectarian institutions of higher education contravene the limitations placed upon the power of the General Assembly of Virginia by Section 11 of Article VIII of the Constitution of Virginia in that the appropriation of public funds for such purpose conflicts with the prohibitions in Section 16 of Article I, Section 16 of Article IV, Section 10 of Article VIII and Section 8 of Article X of the Constitution of Virginia, and violates the First and Fourteenth Amendments to the Constitution of the United States.

These arguments raise the four questions which are set forth below.

(1) Do Section 11 of Article VIII of the Virginia Constitution and the Acts violate the proscription imposed by the Establishment Clause of the First Amendment?

(2) Do Section 11 and the Acts violate the Fourteenth Amendment?

(3) Do the loans and grants authorized by the Acts violate the limitations imposed on the General Assembly by Section 16 of Article I, Section 16 of Article IV, Section 10 of Article VIII, and Section 8 of Article X of the Constitution of Virginia?

(4) Do the Acts provide for loans within the meaning of Section 11 of Article VIII?

## I

*Do Section 11 of Article VIII of the Virginia Constitution and the Acts violate the proscription imposed by the Establishment Clause of the First Amendment?*

First, the Comptroller suggests that the First Amendment question would be eliminated if we construed Section 11 to limit loans to students who are attending nonsectarian institutions of higher education.

We must reject this suggestion, however, in light of the history of the section and the fact that to adopt this view would make the section meaningless.

Section 11 was added as a new section to the Constitution on July 1, 1971, in language identical with that proposed by the Commission on Constitutional Revision.

In its commentary on Section 11 the Commission had this to say:

"The proposed section, drafted in very precise language, allows two kinds of programs which the Commonwealth may undertake to assist non-profit institutions of higher education in Virginia (other than those whose purpose is to provide religious or theological education): state loans to students at such institutions, and the creation of a state agency or authority to assist in borrowing money for construction of educational facilities at such institutions.*

"The proposal is a modest, but important, response to the crisis facing private universities and colleges in Virginia. Private institutions presently enroll approximately one-third of all undergraduates

---

*Footnote deleted.

in Virginia, at no expense to the Commonwealth. Yet rising costs are squeezing private colleges and universities to the point where a distinguished educator has expressed the fear that in ten years' time 'only a handful of extremely well endowed private institutions' in the entire nation 'will remain as viable quality institutions.'* In a number of states, private institutions have had to be absorbed into the state system as the only alternative to closing their doors. Should private colleges in Virginia be unable to pull their share of the load, the result would be serious on two counts: greater cost to the Commonwealth to educate students who would have been in private institutions, and a weakening of Virginia's rich heritage of pluralism and diversity in higher education.

"The Commission does not propose any state appropriations to private colleges and universities. Its proposals are much more modest. In the first place, the proposed section would allow the Commonwealth to extend to students in private institutions, whether church-related or not, loan programs available to students in public or private nonsectarian colleges in Virginia. For example, students in church-related colleges could be made eligible for the State Teacher Scholarships given by the State Board of Education. These loans, given to undergraduates preparing for teaching in the public school system, can be cancelled either by a specified period of teaching or by repayment.

\*     \*     \*

"The proposed section has been fashioned so as to avoid involving the Commonwealth in religious activities. To begin with, the section excludes any aid to institutions whose primary purpose is to provide religious training or theological education.* Thus, for example, a theological seminary would not qualify. Among those colleges and universities which would qualify, the section makes no distinction between those which are church-related and those which are not. Many of the private colleges in Virginia are church-related, but typically they operate like any other college. For example, of the twelve members of the Association of Independent Colleges (composed of nearly all of the accredited private non-profit four-year colleges in Virginia) nine have some degree of church relationship. Yet none of the nine (all ineligible for any form of aid under the present Constitution) imposes any religious tests for student admission or faculty selection, and none serves primarily a

---

*Footnote deleted.

single religious faith.* All, in short, are an integral part of Virginia's commitment to higher education, their doors open without discrimination to the youth of the Commonwealth. The proposed section, in the judgment of the Commission, recognizes their contribution without in any way weakening the wall of separation between church and state so carefully erected in other sections of the Constitution." Report of the Commission on Constitutional Revision, 1969, pp. 272-73.

The language of Section 11 authorized legislation for making loans to students attending sectarian colleges whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education and the commentary can leave no doubt that the purpose of the section was not to restrict loans to students attending non-sectarian colleges.

■ The Comptroller next argues that the decision here is controlled by *Almond* v. *Day*, 197 Va. 419, 89 S.E.2d 851 (1955). We do not agree.

Our decision in *Almond* v. *Day* was based upon Section 141 of the Virginia Constitution of 1902 as it was then written. After that decision Section 141 was amended in 1956 and it was later readopted, as amended, as Section 10[3] of Article VIII of the Virginia Constitution of 1971.

Section 11, a new addition in the 1971 Constitution, was adopted

---

*Footnote deleted.

[3]*Section 10. State appropriations prohibited to schools or institutions of learning not owned or exclusively controlled by the State or some subdivision thereof; exceptions to rule.*

No appropriation of public funds shall be made to any school or institution of learning not owned or exclusively controlled by the State or some political subdivision thereof; provided, first, that the General Assembly may, and the governing bodies of the several counties, cities and towns may, subject to such limitations as may be imposed by the General Assembly, appropriate funds for educational purposes which may be expended in furtherance of elementary, secondary, collegiate or graduate education of Virginia students in public and nonsectarian private schools and institutions of learning, in addition to those owned or exclusively controlled by the State or any such county, city or town; second, that the General Assembly may appropriate funds to an agency, or to a school or institution of learning owned or controlled by an agency, created and established by two or more States under a joint agreement to which this State is a party for the purpose of providing educational facilities for the citizens of the several States joining in such agreement; third, that counties, cities, towns and districts may make appropriations to nonsectarian schools of manual, industrial or technical training and also to any school or institution of learning owned or exclusively controlled by such county, city, town or school district.

with the specific purpose of making possible a loan program which would be free of the restrictions which might otherwise apply because of Section 10. Hence cases construing Section 10 are inapposite to the present litigation.

In determining the validity of Section 11 and the Acts under the Establishment Clause, this court must be guided by the decisions of the Supreme Court of the United States construing the First Amendment. Extremely pertinent in such a determination is the decision of that Court in *Abington School District* v. *Schempp*, 374 U.S. 203 (1963), which involved the validity of a Pennsylvania statute requiring the reading, without comment, of ten verses from the Holy Bible at the beginning of each school day. In declaring the statute unconstitutional, the Court enunciated the following test for determining the validity of a state statute under the Establishment Clause of the First Amendment:

"The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. *That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.*" (Emphasis supplied.) *Id.* at 222.

Later, in *Board of Education* v. *Allen*, 392 U.S. 236 (1968), the Court sustained a New York statute which required the state to lend textbooks free of charge to all children in private sectarian and non-sectarian schools, recognizing that "the line between state neutrality to religion and state support of religion is not easy to locate. 'The constitutional standard is the separation of Church and State. The problem, like many problems in constitutional law, is one of degree.' *Zorach* v. *Clauson*, 343 U.S. 306, 314 (1952)." *Id.* at 242.

In *Walz* v. *Tax Commissioner*, 397 U.S. 664 (1970), the Court upheld tax exemptions for real property owned by religious organizations and used for religious purposes and stated:

"Determining that the legislative purpose of tax exemption is not aimed at establishing, sponsoring, or supporting religion does not end the inquiry, however. *We must also be sure that the end result —the effect—is not an excessive government entanglement with reli-*

*gion. The test is inescapably one of degree."* (Emphasis supplied.) *Id.* at 674.

These criteria—purpose, primary effect and degree of entanglement —were applied most recently in *Tilton* v. *Richardson,* 403 U.S. 672 (1971), a case which is wholly dispositive of the First Amendment question now presented to us. There, the Supreme Court upheld the Higher Education Facilities Act[4] under both the Establishment Clause and the Free Exercise Clause of the First Amendment. That Act authorized federal grants and loans to institutions of higher education including church related colleges and universities, for the construction of buildings and facilities used exclusively for secular educational purposes. The Act expressly excluded "any facility used or to be used for sectarian instruction or as a place for religious worship, or . . . any facility which . . . is used or to be used primarily in connection with any part of the program of a school or department of divinity . . . ."[5]

After acknowledging that the "tests" enunciated in *Abington School District* and *Walz* should be used as "guidelines" rather than as absolutes and that it could "only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication," the Court proceeded to analyze the Act. 403 U.S. at 678.

First, in order to cipher the purpose of the Act, the Court turned to its preamble which declared that:

"[T]he security and welfare of the United States require that this and future generations of American youth be assured ample opportunity for the fullest development of their intellectual capacities and that this opportunity will be jeopardized unless the Nation's colleges and universities are encouraged and assisted in their efforts to accommodate rapidly growing numbers of youth who aspire to a higher education."[6]

The Court found that the preamble "expresses a legitimate secular objective entirely appropriate for governmental action." 403 U.S. at 679.

[4]20 U.S.C. §§ 711-721 (1964 ed. Supp. V).
[5]20 U.S.C. § 751 (a) (2) (1964 ed. Supp. V).
[6]20 U.S.C. § 701.

Turning next to the primary effect of the legislation, the Court stated that "[t]he crucial question is not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion." 403 U.S. at 679. Finding that the Act "was carefully drafted to ensure that the federally subsidized facilities would be devoted to the secular and not the religious function of the recipient institutions," and acknowledging the fact that "[t]he simplistic argument that every form of financial aid to church-sponsored activity violates the Religion Clauses was rejected long ago," the Court found that the primary effect of that Act does not advance religion. 403 U.S. at 679-682. In so doing, the Court also rejected the argument "that religion so permeates the secular education provided by church-related colleges and universities that their religious and secular educational functions are in fact inseparable." 403 U.S. at 680.

Finally, the Supreme Court determined that the Act did not constitute an excessive entanglement between government and religion. The Court distinguished its decisions in *Lemon* v. *Kurtzman* and *Robinson* v. *DiCenso*, 403 U.S. 602 (1971), in which it had struck down state programs under which aid was provided to parochial elementary and secondary schools because of excessive governmental entanglement with religion. The Court found compelling distinctions between parochial elementary and secondary schools and church-related colleges and universities:

"There are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools. The 'affirmative if not dominant policy' of the instruction in pre-college church schools is 'to assure future adherents to a particular faith by having control of their total education at an early age.' *Walz* v. *Tax Comm'n*, *supra*, at 671. There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. Common observation would seem to support that view, and Congress may well have entertained it. The skepticism of the college student is not an inconsiderable barrier to any attempt or tendency to subvert the congressional objectives and limitations. Furthermore, by their very nature, colleges and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal disciplines. Many church-related col-

leges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students." (Footnotes omitted.) 403 U.S. at 685-86.

The factors which led the Supreme Court to uphold the Act are equally persuasive in construing Section 11 of Article VIII and Chapters 18 and 19. The "legitimate secular objective" of Section 11 is clearly shown by the passages from the Report of the Commission on Constitutional Revision set forth earlier. Similarly, the secular purpose of Chapters 18 and 19 is manifest in the preamble to Chapter 18.[7]

As is true under the Higher Education Facilities Act, which was clearly in the minds of the Commission on Constitutional Revision,[8] Section 11 and Chapters 18 and 19 have a secular purpose whose primary effect is not to advance or inhibit religion and the administration of which does not constitute an excessive entanglement of government with religion and we so hold.

## II

*Do Section 11 and the Acts violate the Fourteenth Amendment?*

■ On this point the Comptroller presents a two pronged argument. He first argues that Section 11 and the Acts, by limiting loans to Virginia students attending nonprofit institutions of higher education in the Commonwealth, discriminates against Virginia students attending proprietary institutions of higher learning in the Commonwealth and Virginia students attending institutions of higher learning outside the Commonwealth. His second argument is that the Acts unreasonably discriminate against (1) students receiving grants or loans of public funds under other legislative enactments which impose an obligation for repayment either in money or service, (2) students who are not capable of making satisfactory academic progress in their prescribed course, and (3) students who may be compelled to withdraw during the academic year for reasons deemed to be meritorious to them, but not deemed meritorious by the administering agency.

The present case does not involve so-called "suspect" classifications (e.g., race) or classifications touching "fundamental" rights (e.g., voting)—classifications which might call for a higher standard of re-

[7]See fn. 1 *supra*.

[8]Report of the Commission on Constitutional Revision, page 274, N.38.

view on the part of a court. The question is therefore to be tested by more traditional standards of equal protection.

The test, as laid down by the Supreme Court in *McDonald* v. *Board of Elections*, 394 U.S. 802 (1969), is:

> "The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons *totally unrelated* to the pursuit of that goal. Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them." (Emphasis supplied) *Id.* at 809.

Reasons to justify the lines drawn in Section 11 and in the Acts may readily be conceived. The Comptroller argues, for example, that Section 11 unduly discriminates against students attending institutions operated for profit. It is a commonplace, however, for government to make distinctions between those in business for a profit and those who have eleemosynary motives. Both state and federal tax laws, for example, are replete with instances of tax exemptions or deductions which turn on an undertaking being conducted "not for profit" or having no part of its net earnings inuring "to the benefit of any private shareholder or individual." [9] It is certainly rational, and therefore compatible with the Equal Protection clause, for government to pursue a policy which does not funnel state loans into the hands of students who, attending institutions conducted for profit, necessarily are paying tuition fees set at a level which makes possible that profit.

The Comptroller argues that Section 11 unduly discriminates against students who attend out-of-state institutions. Again, reasons to justify such a classification may readily be conceived. Those who drafted Section 11 may well have concluded that students attending institutions within the State would be more likely to remain in Vir-

[9] See, e.g., Va. Code Ann. § 58-12 (1969), which in describing property exempt from State and local taxes commonly limits the exemptions to undertakings "not operated for profit"; Va. Code Ann. § 58-81 (m) (1969), which in defining deductions on Virginia income tax for charitable contributions requires that no part of the net earnings of the donee organization inure "to the benefit of any private shareholder or individual"; and Internal Revenue Code of 1954 § 2522, which has a limitation on charitable contributions like that of Va. Code Ann. § 58-81 (m).

ginia after graduation and that the loan money in their hands would be a better investment for the Commonwealth. Or the revisors may have concluded that those who administered a loan program would find it more difficult to ascertain whether an out-of-state institution's standards complied with the requirements of the program, and would find it harder to control abuses in the program, than they would if loans went only to students attending institutions in Virginia. That there is a rational basis for the classification is apparent. Indeed, if this classification is not valid, then there would be doubt as to the power of the Commonwealth to give aid even to students in Virginia's public colleges without giving like aid to students attending colleges in other states.

Like reasoning disposes of the Comptroller's contention that the conditions of Chapters 18 and 19 unduly discriminate against students receiving loans which they must repay in cash or service, students who are not capable of making satisfactory academic progress in their prescribed course, and students who are compelled to withdraw during the academic year for reasons not thought by the administering agency to be meritorious. It would seem tedious to develop hypothetical justifications for each of these distinctions; the same analysis employed in the preceding paragraphs readily yields reasons that such distinctions—which are commonplace in loan programs—are not invidious. For example, it is certainly reasonable for a legislative body to want to preserve the integrity of a loan program by requiring that a borrower stay in school, withdraw only for meritorious reasons, and make satisfactory academic progress.

In short, as to all the distinctions drawn by Section 11 and by Chapters 18 and 19, and called into question by the Comptroller, a rational basis for those classifications may readily be conceived. This is all that Equal Protection requires on the facts of this case.

## III

*Do the loans and grants authorized by the Acts violate the limitations imposed on the General Assembly by Section 16 of Article I, Section 16 of Article IV, Section 10 of Article VIII, and Section 8 of Article X of the Constitution of Virginia?*

The Comptroller asserts that the Acts violate Section 16 of Article I concerning the free exercise of religion, Section 16 of Article IV concerning appropriations to religious bodies, Section 10 of Article VIII concerning grants or loans to Virginia students attending pub-

lic and nonsectarian private schools and institutions of higher learning, and Section 8 of Article X concerning limits of tax or revenue. In making this argument the Comptroller ignores two of the basic tenets of constitutional construction.

In *Pierce v. Dennis*, 205 Va. 478, 138 S.E.2d 6 (1964), we considered a statute which if viewed solely under one section of the Constitution would be valid, but if viewed solely under another section would be invalid. In that case we noted that all provisions of the Constitution should be construed together whenever possible. If there is conflict, however, the specific provision must govern over the general provision. In applying those principles, we held that when an act is adopted in the manner prescribed by and pursuant to the authority of a specifically drawn section of the Constitution, its validity is unassailable upon the grounds of unconstitutionality under the more general provisions of other sections of the Constitution.

The principles set forth in *Pierce* are dispositive of the issue raised here. Chapters 18 and 19 were adopted in the manner prescribed by and pursuant to the authority of Section 11 of Article VIII, a section narrowly drawn in precise language. To rule these Chapters unconstitutional under the general principles of other sections would do violence to the intention of the revisors of the Constitution, which is clearly revealed in their commentary, and of the General Assembly, as well as violate the principles of construction so followed in *Pierce*.

## IV

*Do the Acts provide for loans within the meaning of Section 11 of Article VIII?*

The Attorney General and *amicus curiae*, while conceding that the loans authorized by the Acts are not loans in the ordinary commercial sense, argue that we should hold that the word "loans" as used in Section 11 is broad enough to include loans repayable either in money or in academic progress by the student as provided by the Acts.

In support of this position they point to the commentary to Section 11 in which the Commission on Constitutional Revision referred to the State Teacher Scholarships as an example of the assistance which could be made available by the Commonwealth to students attending those church related colleges which are not disqualified under the restrictions imposed by Section 11. They also argue that we should accept the construction placed on Section 11 by the 1972 General

Assembly as justifying this definition of loans. Their final argument is that loans as used in the context of higher education include provision for repayment or cancellation of loans by academic progress.

While these arguments are both ingenious and appealing, we must conclude that the Acts provide for conditional grants or gifts and not loans within the context and meaning of that term as used in Section 11.

It is true that the loans provided by the State Teacher Scholarships program may be repaid by credit obtained from teaching in one of the public schools of the Commonwealth, an act of public service to the Commonwealth. Under the Acts, however, no obligation of public service arises. The student, to qualify for credit, need do nothing more than would ordinarily be expected of him, namely to make normal progress toward completion of his course of study. Thus the education is a direct benefit to the student but not to the Commonwealth. Nor is there any obligation that the student, after completing his education, remain in the Commonwealth to confer upon it such indirect benefits as may flow from a better educated citizenry.

Despite our view that the "loans" in question are gifts or grants, we might nevertheless validate so much of the program in Chapter 19 as provides financial aid to students attending *non-sectarian* institutions if this part of the statute is severable, because Section 10 of Article VIII permits grants to students in nonsectarian institutions. But the presumption against severability that arises from the absence of a severability clause in Chapter 19 is strengthened by the inclusion of such a clause in Chapter 18. The final test of severability, however, is legislative intent. Here it is apparent from the interwoven provisions of the statute that the General Assembly viewed the program included in Chapter 19 as an indivisible unit. Hence, the void portion permeates the entire legislative scheme so that the whole chapter must fall. *See Boyles* v. *City of Roanoke*, 179 Va. 484, 19 S.E.2d 662 (1942); *cf. City of Waynesboro* v. *Keiser*, this day decided, 213 Va. 229, 191 S.E.2d 196.

Since the Acts provide for conditional gifts or grants, not loans, they violate Section 11 of Article VIII and since such gifts or grants may be made to students in sectarian institutions, they violate Section 10 of Article VIII. Therefore, we must hold the Acts unconstitutional in these respects and refuse the writs.

*Writs refused.*