**Nhi V. PHAN, Appellant,**

**v.**

**The COMMONWEALTH OF VIRGINIA, Dickerson, Altamont Jr., Comm. Va. Dept. of Rehabilitative Service, Appellees.**

No. 85–1857.

United States Court of Appeals,
Fourth Circuit.

Argued May 6, 1986.

Decided Dec. 12, 1986.

Steven A. Standiford, Washington, D.C., for appellant.

Phyllis Katz, Asst. Atty. Gen., Richmond, Va., (Mary Sue Terry, Atty. Gen., Paul J. Forch, Senior Asst. Atty. Gen., Richmond, Va., on brief) for appellees.

Before WINTER, Chief Judge, and RUSSELL and PHILLIPS, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

Nhi V. Phan, an indigent handicapped Virginia resident, sought a declaratory judgment and supplemental relief to establish that he is entitled to financial assistance to enable him to attend St. Andrews Presbyterian College, a church-affiliated liberal arts college in North Carolina that provides special services and facilities for handicapped students, and to require the Commonwealth to provide such aid.

Essentially Phan challenges a series of appropriations restrictions embodied in the Constitution of Virginia. While Virginia provides financial assistance to handicapped residents attending any college in Virginia, including church-affiliated schools, or any nonsectarian college outside of Virginia, the Attorney General of Virginia has issued a formal opinion that the state constitution prohibits payment of state funds to church-affiliated colleges located outside Virginia.

The district court dismissed Phan's complaint, and he appeals. Because the record is unclear as to whether there is a reasonable basis for the discrimination apparent in the Virginia scheme of financial educational aid to the handicapped and whether the Virginia law is being evenly applied, we vacate the judgment and remand the case for further proceedings.

## I.

The facts of the case were stipulated and need only be briefly stated.

Phan is a 20 year old citizen of the Republic of Vietnam and is a permanent resident alien of the United States. His foster father, Steven A. Standiford, is a citizen and resident of Virginia. As a result of polio, Phan is unable to walk without aid. He achieves mobility by means of crutches and leg braces, a wheelchair and a motor vehicle specially equipped with hand controls. He is "severely handicapped" as defined in the Vocational Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et. seq.

Phan graduated from Washington & Lee High School, Arlington, Virginia, in June, 1984. After consulting with his high school guidance counselor to determine which colleges were accessible to the mobility impaired, Phan applied for admission to St. Andrews Presbyterian College in Laurinburg, North Carolina, a non-profit liberal arts college affiliated with the Presbyterian synod of North Carolina. Although church related,[1] the primary purpose of St. Andrews is to provide collegiate or graduate education and not to provide religious training by theological education.

Phan was accepted at St. Andrews and he was granted financial assistance from St. Andrews in the amount of $7,600 for the 1984–85 academic year contingent upon his matriculation in September, 1984.

Phan and his foster father both sought financial assistance from the Commonwealth, under its program of financial aid to the handicapped, financed approximately 80% by the federal government and approximately 20% by Virginia. Phan was determined to be eligible for a grant.

Virginia has no policy against persons eligible for grants using out-of-state institutions for higher learning. While recipients are encouraged to use in-state facilities, they may, with the approval of the Virginia Department of Rehabilitative Services, obtain training services out-of-state. Virginia has paid for handicapped students to attend church-related schools in Virginia, such as Liberty Baptist College, Eastern Mennonite College, Virginia Union University, Virginia Wesleyan College, Terrum College and the University of Richmond. The primary purpose of these institutions is to provide collegiate or graduate education and not to provide religious training or theological education. Virginia has paid for handicapped students to attend non-

---

**1.** Twenty-four of St. Andrews' thirty-six trustees are appointed by the North Carolina Synod of the Presbyterian church of the United States and approximately five per cent of its revenues are derived from the church.

church-related schools throughout Virginia and elsewhere throughout the nation including schools in California, Texas, Pennsylvania, Washington, D.C., Maryland and Georgia.

Phan has been denied financial aid to attend St. Andrews solely because it is a church-related school.

The denial of aid to attend St. Andrews is grounded upon three overlapping provisions of the Constitution of Virginia that operate to deny Phan financial aid to defray expenses associated with attendance at any church-affiliated school outside Virginia. Article IV, § 16 prohibits appropriations of public funds to any church or sectarian society or any institution controlled by a church or sectarian society:

> The General Assembly shall not make any appropriation of public funds, personal property or real estate to any church or sectarian society, or any association or institution of any kind whatever which is entirely or partly, directly or indirectly, controlled by any church or sectarian society.[2]

Article VIII, § 10 governs appropriations of state funds to non-public schools:

> No appropriations of public funds shall be made to any school or institution of learning not owned or exclusively controlled by the state ... provided ... that the General Assembly may ... appropriate funds for education purposes which may be expended in furtherance of ... collegiate ... education of Virginia students in public and nonsectarian private schools and institutions of learning, in addition to those owned or exclusively controlled by the State.

For more than 25 years, the state has interpreted the provision for appropriations for nonpublic education to permit tuition grants to students attending nonsectarian private schools both inside and outside Virginia.

Until the passage of Article VIII, § 11, Virginia could not provide assistance to church-affiliated schools. Art. VIII, § 11 was proposed primarily to permit state assistance to financially hard-pressed private institutions of higher learning, whether church-related or not, by making loan programs available to students in such institutions. *See* The Constitution of Virginia— Report of the Commission on Constitutional Review, pp. 273–74 (1969). The relevant language of § 11 as finally adopted is:

> The General Assembly may provide for loans to, and grants to or on behalf of, students attending nonprofit institutions of higher education in the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education.

Unlike § 10, § 11 contains an explicit geographic limitation; Virginia provides financial aid to students attending church-affiliated institutions only within the Commonwealth.

Phan challenges this collage of restrictions, which permits state assistance to students attending both in-state and out-of-state nonsectarian schools and to students attending sectarian schools located in-state. His arguments are based upon the Establishment Clause and the Fourteenth Amendment. He also argues that even if tuition aid to attend St. Andrews was validly denied him, he nevertheless may validly receive payment for books, transportation and related expenses. We consider these contentions seriatim.

## II. Establishment Clause

For a statute to survive scrutiny under the establishment clause, (1) it must have a secular legislative purpose; (2) its primary effect must neither advance nor inhibit religion; and (3) it must not foster excessive entanglement with religion. *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct.

---

2. Virginia defines as sectarian any institution that is "under the control, domination or governing influence of any religious body or sect." 1976–1977 Report of the Attorney General at 37. St. Andrews is deemed as a sectarian institution because twenty-four of the thirty-six members of the Board of Trustees are appointed by the North Carolina Synod of the Presbyterian Church of the United States. *Id.* at 36–37.

2479, 2489, 86 L.Ed.2d 29 (1985), *citing Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Phan contends that distinguishing out-of-state schools on the basis of religious affiliation violates the second prong of the *Lemon* test, in that it impermissibly disfavors church-affiliated colleges.

Existing jurisprudence renders this contention unpersuasive. Phan concedes that Virginia could permissibly ban any use of state funds which might aid religion, as indeed the Supreme Court has suggested. *See Witters v. Washington Department of Services for the Blind,* —— U.S. ——, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (Washington's program of providing tuition assistance to blind students seeking higher education does not offend federal Constitution's prohibition on the establishment of religion, even though at least one student used tuition subsidy to finance his study for the ministry). In remanding that case, the Court noted that the state courts were free to consider whether the funding program ran afoul of the stricter prohibition of establishment of religion embodied in the Washington state constitution.[3] Thus, the Court recognized that whether to fund religious studies along with other post-secondary education lies within a permissible zone of accommodation of religion but is not mandatory. A choice not to fund out-of-state studies at church-affiliated institutions would therefore not offend the establishment clause of the federal Constitution.[4]

Because the Virginia program contemplates that some state monies will flow to sectarian schools, it is difficult to sustain an establishment clause challenge based on an asserted hostility to religion. *See Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952) (government cannot prefer nonreligion to religion); *Everson v. Board of Education,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1949) (neither state nor federal government "can pass laws which aid one religion, aid all religions, or prefer one religion over another.")[5]

We therefore see no merit in the establishment clause contention.

### III. Equal Protection

■ Phan's equal protection challenge has two components. First he contends that the provisions at issue combine to deprive him of his fundamental right to travel and to exercise his religious freedom. Alternatively, he urges that even if no fundamental right is infringed, the prohibition of aid to out-of-state sectarian colleges should be struck down as irrational.

#### A. Right to Travel

Contrary to Phan's suggestion, the constitutionally protected right to interstate travel does not comprehend his situation. The cases on which Phan relies generally concern situations in which a state discriminates against newcomers in the provision of important services, effectively discour-

---

3. The Court declined to decide whether the free exercise clause required Washington to extend vocational rehabilitation funds to Witters without regard to his program of study. —— U.S. at ——, 106 S.Ct. at 752.

4. We note parenthetically that it would seem bizarre suddenly to hold that the establishment clause requires the state to fund religious studies along with secular studies when there has been grave doubt until quite recently that the establishment clause even permitted such assistance.

5. Phan has not argued, and we do not decide, whether Virginia's preference for in-state sectarian schools over out-of-state sectarian schools has the primary effect of advancing particular sects. For example, of the five in-state sectarian

schools about which testimony was heard at trial, two were Baptist institutions and two were Methodist affiliates. The fifth was a Mennonite College. By contrast, certain religions or denominations may be underrepresented in Virginia, i.e., groups such as Catholics, Jews, Moslems, etc. are not only outnumbered politically but also they do not appear to maintain sectarian schools in Virginia, although they may in other states. Since it is apparently uncontradicted that the constitutional amendment permitting aid to in-state sectarian colleges resulted from intense lobbying by those schools, it is conceivable that this provision effectively channels aid to some sects to the exclusion of others. However, such a claim has not been presented in this case.

aging immigration by those from out-of-state. *See, e.g., Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (durational residency requirements for free medical care excessively burden right to travel); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (durational residency requirements for welfare unjustifiably burden right to interstate travel). In the instant case, however, Phan challenges a funding scheme under which the Commonwealth refuses to subsidize interstate migration from Virginia for a particular purpose.

Phan concedes that Virginia could choose to fund only in-state education. *See Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Spatt v. State of New York,* 361 F.Supp. 1048 (E.D.N.Y.1973), *aff'd* 414 U.S. 1058, 94 S.Ct. 563, 38 L.Ed.2d 465 (1973). In fact, Virginia has chosen to subsidize some out-of-state education, i.e., that offered by nonsectarian schools. Thus for Phan to succeed, he must show that the basis for this distinction is constitutionally infirm. This showing must be made under some independent provision of the Constitution, such as the religion clauses, rather than under the right to travel.

## B. Free Exercise of Religion

By reference to the doctrine of unconstitutional conditions, Phan argues that the Virginia system infringes his right freely to exercise his religion. This approach, too, is lacking in merit.

As embodied in *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), the doctrine of unconstitutional conditions prohibits a state from conditioning receipt of a public benefit on the relinquishment of a first amendment right. Phan contends that Virginia's financial aid program forces him to give up his right to attend an out-of-state religious institution in order to receive a subsidy. In support of this position, Phan relies on three cases: *Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (facto-

ry worker belonging to pacifist religion who quits job upon transfer to armaments division still eligible for unemployment benefits); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (state cannot deny unemployment benefits to Sabbatarian declining to work on Saturday); and, *McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1977) (state cannot disqualify clergy from serving as delegates to state constitutional convention).

In *Thomas, Sherbert* and *McDaniel,* the plaintiff faced an unconscionable dilemma created by the state; the state regulatory schemes at issue compelled the individual to choose between foregoing central religious observances and relinquishing an important state benefit or right. Recognizing the manifest unfairness of such a choice, the Supreme Court required the state to accommodate the individual's religious belief.

Phan simply does not fit into this category. While he understandably prefers to attend St. Andrews, an institution capable of addressing both his physical and spiritual needs, other state-sponsored options remain available. Phan could reside in his current community, which apparently provides adequate spiritual support, and attend one of the nearby secular or non-secular colleges which can provide him with the training and living environment that he seeks. He could also move to a different residential community in Virginia or live on campus while attending one of the many church-affiliated colleges in the state which has the facilities to receive him. Phan has not contended that his religion requires him to attend St. Andrews, but merely that that school is best adapted to his needs. The state, however, is not obliged to provide Phan with the optimal situation. Instead, it is merely prohibited from forcing him to relinquish essential beliefs and practices in order to receive financial assistance. Since Phan can both continue to practice his religion and take advantage of the state's financial aid policy, his right freely to exercise his religion has not been infringed.

## C. Minimum Rationality

■ Phan next argues that, even if the provisions at issue implicate no fundamental rights, taken together they advance no legitimate state purpose as applied to plaintiff.[6] Although Phan is undeniably correct that Virginia has failed to articulate a valid rationale for its appropriations scheme, we perceive a possible justification, lingering doubts about which require the remand of this case to the district court.

To support the rationality of its funding scheme, Virginia relies on cases upholding statutes prohibiting state payments to out-of-state schools on the one hand and those upholding statutes forbidding state payments to church-affiliated schools on the other. While Phan concedes that Virginia could validly select either of these courses, he contends that the state's hybrid of the two yields an irrational result. In short, Virginia would have us determine the legitimacy of each of these provisions separately, while Phan urges that they be reviewed together. Logic supports Phan's position, especially because the Supreme Court of Virginia has stated that "all provisions of the Constitution should be construed together whenever possible." *Miller v. Ayres*, 213 Va. 251, 191 S.E.2d 261, 273 (1972).

The legislative history of Article VIII, § 11 reflects a strong interest in promoting and preserving diversity in higher education. Virginia's eagerness to embrace church-affiliated education within the Commonwealth displays a legislative policy favoring neutral support for education, whether sectarian or nonsectarian, and reflects high regard for the role of religion in a pluralistic society.[7] In addition, Virgin-

6. In recent years, the Supreme Court has shown itself increasingly willing to overturn state law under the rational basis test, the most deferential level of scrutiny under the equal protection clause. *See Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (Alaska dividend program distributing state mineral income to adult residents based on the length of their residency invalid because state has no legitimate interest in this distinction); *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (Texas statute withholding from local school districts funds for education of illegal alien children and authorizing districts to deny enrollment to such children held to violate equal protection clause); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (striking zoning ordinance based on irrational prejudice against mentally retarded); *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985) (tax preference favoring Vietnam veterans who established residency prior to a particular date in the past found irrational); *Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (state tax preference favoring domestic insurance companies impermissible because economic discrimination against out-of-state companies is not legitimate state purpose). In each of these cases, the Court displayed greater willingness to penetrate the asserted justifications and to scrutinize more carefully the congruence between legislative ends and legislative means.

Although it has been suggested that this "second order rational basis review," *Cleburne*, 473 U.S. at ——, 105 S.Ct. at 3264 (Marshall, J., concurring and dissenting), occurs in cases in which the law in question approaches, but falls short of, the fundamental rights or suspect classifications usually triggering strict scrutiny, *id.* at 3268–72, our decision proceeds on no such theory. Instead, we proceed from the modest proposition that the simple articulation of a justification for a challenged classification does not conclude the judicial inquiry. *See, e.g., Cleburne*, 105 S.Ct. at 3258 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."), *citing Zobel*, 457 U.S. at 61–63, 102 S.Ct. at 2313–14; *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 535, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973).

7. The constitutional revision committee that proposed Art. VIII, § 11, permitting aid to all in-state schools, noted that private institutions provide a valuable service in relieving the educational burdens on the state and in maintaining diversity and pluralism. Justifying the extension of aid to church-related schools, the Commission stated:

Among those colleges and universities which would qualify, the section makes no distinction between those which are church-related and those which are not. Many of the private colleges in Virginia are church-related, but typically they operate like any other college. For example, of the twelve members of the Association of Independent Colleges (composed of nearly all of the accredited private non-profit four-year colleges in Virginia) nine have some degree of church relationship. Yet none of the nine (all ineligible for any form of aid under the present Constitution) imposes any religious test for student admission or

ia's apparent willingness to fund secular education out-of-state without regard to the availability of equivalent opportunities within the Commonwealth undermines any interest that the Commonwealth could assert in ensuring that state funds flow solely into higher educational institutions within Virginia.[8]

We can hypothesize, however, a rational justification for differential treatment of church-affiliated schools based on their location. The Virginia constitution imposes on the Commonwealth a more severe prohibition of the establishment of a religion than does the federal Constitution.[9] The greater latitude accorded the Commonwealth with regard to sectarian institutions located in Virginia may be understood as reflecting a judgment that the relevant state officials will find it easier and cheaper to determine whether a particular school possesses a primarily religious character if

the school in question is located in Virginia. Simply put, Virginia might have imposed a prohibition on aid to students who attend out-of-state church-related schools as a substitute for the increased amount of monitoring necessary to make fine distinctions based on the primary purpose of a given institution. If, as a matter of fact, the amount of monitoring of out-of-state church related schools necessary to assure compliance with the Virginia constitution is significantly more difficult and more expensive than that required for church-related schools in Virginia, then we think that the differential treatment of church-affiliated schools based upon their location is rational and not constitutionally impermissible.

But this case comes to us not hypothetically but with a record of some proof as to the degree to which Virginia monitors church-related schools to determine that

faculty selection, and none serves primarily a single religious faith. All, in short, are an integral part of Virginia's commitment to higher education, their doors open without discrimination to the youth of the Commonwealth. The proposed section, in the judgment of the Commission, recognizes their contribution without in any way weakening the wall of separation between church and state so carefully erected in other sections of the Constitution. Report of the Commission on Constitutional Revision, 1969, pp. 274, *quoted in Miller v. Ayres*, 213 Va. 251, 191 S.E.2d 251, 268–69 (provision of tuition assistance to students attending private schools within Virginia violates neither the establishment clause nor the equal protection clause). Moreover, the Commission's report indicates strongly that the drafters contemplated the disqualification of only a small class of educational institutions, such as seminaries, focused primarily on religion. In the words of one expert commentator:

*Eligible institutions.* As noted, to qualify under either of the branches of section 11, an institution must (1) be nonprofit and (2) exist primarily for the purpose of providing collegiate or graduate education, not religious training or theological education. That an institution is church-related or church-controlled or has other sectarian aspects does not matter so long as it meets the two tests laid down by section 11. The latter limitation would exclude a theological seminary. But most church-related colleges in Virginia operate like any other private college and would qualify under section 11.

2 A.E. Dick Howard, Commentaries on the Constitution of Virginia, 962 (1974).

**8.** Our conclusion does not conflict with that of the Supreme Court of Virginia in *Miller v. Ayres*, 213 Va. 149, 191 S.E.2d 261 (1972). There, the court found two rational bases for the geographical limitation contained in § 11: (1) the theory that students attending colleges in Virginia would be more likely to settle permanently in the Commonwealth and (2) the notion that administration of loan programs and monitoring of academic standards at eligible institutions would be easier if only Virginia schools could participate. *Id.* 191 S.E.2d at 272–73. As Phan concedes, § 11, standing alone, has a rational basis. However, the juxtaposition of § 11 with § 10, which permits financial assistance to students at secular, out-of-state institutions, produces the anomalous result complained of. That Virginia could validly offer financial aid only to students attending Virginia schools is irrelevant, because the Commonwealth has not in fact done so. Indeed, it is the Commonwealth's inconsistent choices that highlight the potential irrationality of the funding restrictions.

**9.** For example, § 11 prohibits the appropriation of funds to students attending theological seminaries, *see supra*, while a recent decision of the Supreme Court indicates that such expenditures would not offend the federal establishment clause. *Witters,* —— U.S. at ——, 106 S.Ct. at 748 (1986).

they afford secular and not theological education. The record, however, is not complete and we conclude that we must remand the case to the district court with instructions to determine fully how Virginia determines the primary purpose of church-related in-state schools, to what extent it monitors and re-evaluates institutions determined to be eligible for financial aid to qualified students, and whether Virginia could similarly monitor out-of-state colleges without incurring significantly greater effort or expense than those attendant on its current method of determining whether an out-of-state school is church-affiliated, all to the end that the theoretical rational justification may be proved or disproved and it may be determined that there is no denial of equal protection in the administration of the Virginia scheme.[10]

With regard to Virginia's efforts to monitor in-state schools, we note that, at the time the Virginia constitution was amended, the drafters of § 11 stated that none of the church-affiliated schools that it would embrace imposed a religious test for the admission of students or the selection of faculty or served primarily a single religious faith. *See supra* note 7. Subsequently, Virginia has begun to assist students who attend Liberty Baptist College, which requires students and faculty to sign a profession of faith and adherence to the doctrines of Thomas Road Baptist Church, requires students to attend religious services four times per week, and requires students to complete seven religion courses in order to graduate. Virginia also assists students who attend Eastern Mennonite College which requires students to complete five religious courses in order to graduate and to attend religious services 2–3 times per week. The district court

should consider this evidence in determining the criteria according to which Virginia identifies the primary purpose of a college and the attention it gives to monitoring the continuity of that purpose.

With regard to Virginia's ability to monitor out-of-state schools at only marginally increased costs, we observe that Virginia's current method of ascertaining whether a particular out-of-state institution is church-affiliated involves review of the school's public documents, such as its catalogue, written contact with school administrators and telephone conversations with school officials. Thus, the district court must determine whether it would impose a significantly greater burden in effort and money to require Virginia to use the same or similar materials to determine whether an institution exists primarily for the purpose of providing religious or theological training. Presumably, such a determination could be made according to such objective criteria as matriculation requirements, degrees conferred, and graduation requirements.

## IV. Incidental Expenses

■ Phan and Virginia disagree as to whether Phan litigated before the district court his right to be reimbursed for incidental expenses such as books, transportation and living expenses other than tuition and fees levied by St. Andrews. Phan's complaint requests that he be awarded "all financial aid for his college expenses at St. Andrews that plaintiff would otherwise be entitled to if he were attending any other institution approved by the Attorney General of Virginia." Construed liberally, as befits a first amendment/equal protection claim, this seems to comprehend expenses incidental to attendance at St. Andrews. Phan presented evidence on these issues and argued this question in the post-trial

---

**10.** While we do not decide if such is the case, theoretically Virginia may not monitor church-related in-state schools to determine if aid to their students accords with the limitations of Article VIII, § 11 that aid not given to students who attend church-related schools whose primary purpose is to provide religious training or theological education. If the spirit and letter of § 11 are not being enforced, there would be

under familiar principles of a law an irrational and discriminatory application of constitutional provisions which may otherwise have a valid purpose. In that event plaintiff may be entitled either to require strict enforcement of the limitations of § 11 or to be given state aid to attend St. Andrews on the theory that the limitation of § 11 has been rendered nugatory by state administrative procedure.

brief submitted to the district court in lieu of closing argument.

In pressing his claim, Phan cannot draw much support from *Almond v. Day*, 197 Va. 419, 89 S.E.2d 851 (1955). There, construing a predecessor to § 10, the Supreme Court of Appeals of Virginia discussed the distinction between tuition and fees, the payment of which the court found to aid directly the receiving institution, and textbooks and transportation. Instead of reading into the state constitution the child benefit theory approved in *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (New Jersey statute subsidizing transportation to and from parochial schools not an establishment of religion violative of the first amendment because benefits flow to child and parents, rather than to school), the Virginia court simply observed that, whatever the proper treatment of transportation subsidies, tuition subsidies were clearly improper because the student or his parents to whom payment is made acted simply as conduits for payment to the school. This holding was superseded by the adoption of the current Article VII, § 10.[11] *Almond v. Day* thus provides no guidance on the question of incidental expenses; it is outdated jurisprudentially in that the federal establishment clause permits more state assistance to religion than it was thought to allow in 1955, and the result has been altered by state constitutional reform. Thus, on the question of incidental expenses, we write on a clean slate.

Under the current state of federal constitutional law, state subsidy of religiously affiliated institutions of higher learning as part of a neutral program of assistance to higher education lies within the permissible zone of accommodation. Thus, nothing disables Virginia from choosing to provide such financial assistance. Phan calls on us to hold that Virginia has exercised this choice in his favor.

Exercising caution appropriate to a federal court called upon to interpret a state constitution, we believe that the Virginia constitution does not prohibit reimbursement for Phan's incidental expenses. To begin with the easiest constitutional obstacle, we think that Article IV, § 16 does not prohibit the requested reimbursement because the subsidy would go to Phan and would not enrich St. Andrews. Article VIII, § 10 lays down the general rule that public appropriations shall not be made to nonpublic schools and then provides an exception for education of Virginia students in nonsectarian and public institutions in other states. Again, reimbursement for incidental expenses passes muster here because the subsidy plaintiff seeks would not be an appropriation to a disqualified school. Section 11, of course, is irrelevant, because it concerns only education in Virginia.

By analogy to the federal line of reasoning beginning with *Everson* and culminating most recently in *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (permitting tax exemptions for public and private school expenses), it seems likely that Virginia would follow the prevailing view that subsidies directed to the student, who can use them where he pleases, do not constitute the appropriations to out-of-state sectarian schools prohibited by the Virginia constitution through its several provisions.[12] Thus, an independent grant program designed to assist the handicapped remains free to provide the requested reimbursement.

**11.** In 1956 after the decision in *Almond v. Day*, § 10 was amended by the "tuition grant amendment, which authorized the General Assembly and the localities to appropriate public funds for the education of Virginia students in public and nonsectarian private schools, subject to such limitations as the General Assembly might impose." 2 A.E. Dick Howard Commentaries on the Constitution of Virginia, 950 (1974). This constituted a legislative reversal of *Almond's* holding that tuition grants to students ran afoul of the constitutional prohibition against appropriations to any school not owned or exclusively controlled by the Commonwealth.

**12.** An expert commentator has observed that nothing in the language of § 10 prevents the Virginia courts from adopting the "child benefit" theory or a similar approach. 2 A.E. Dick Howard, Commentaries on the Constitution of Virginia, 962 (1974).

We therefore conclude that there is no Virginia constitutional barrier to Phan's entitlement to financial aid in reimbursement for incidental educational expenses such as books, transportation and living expenses other than tuition and fees exacted by St. Andrews.

REVERSED AND REMANDED.